[No. S004776. Crim. No. 26410. Nov. 18, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT FREDERICK GARCEAU, Defendant and Appellant.

150

154

## COUNSEL

Doron Weinberg, under appointment by the Supreme Court, Denis Kendall and Lynne Shatzkin Coffin for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Arnold O. Overoye, Assistant Attorney General, Ward A. Campbell and Lisbeth Bellet, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

GEORGE, J.—Following the guilt phase of a jury trial, the jury found defendant Robert Frederick Garceau guilty of two counts of first degree

murder (Pen. Code, §§ 187, 189),[1] and found true the allegation of personal use of a knife in the commission of each offense (§ 12022, subd. (b)) and a multiple-murder special circumstance (§ 190.2, subd. (a)(3)). At the penalty phase, the jury fixed the penalty at death, and thereafter the court imposed a sentence of death.

This case reaches us on automatic appeal. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) We affirm the judgment in its entirety.

## FACTS

The evidence at trial established that on September 6 or 7, 1984, in a Bakersfield apartment, defendant fatally stabbed his girlfriend, Maureen Bautista, in the presence of her 14-year-old son, Telesforo. Immediately thereafter, defendant fatally stabbed Telesforo. Several hours after defendant committed the murders and departed from the crime scene, two of his acquaintances, Greg Rambo and Larry Tom Whittington, returned to the apartment and concealed the victims' bodies inside a bedroom dresser. Defendant and Rambo transported the dresser containing the bodies out of Kern County to the town of Shandon, located in San Luis Obispo County, entombing the dresser beneath a layer of fresh concrete in the yard behind Rambo's residence.[2]

Although no physical evidence was discovered linking defendant to the Bautista murders, several of his acquaintances testified that he confessed committing the crimes to them prior to his arrest in March of 1985. The defense focused upon impugning the credibility of these witnesses. Defendant did not present an alibi defense, nor did he testify.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Five months after these events, on February 19, 1985, defendant fatally shot Greg Rambo. The evidence suggested that Rambo had been killed in a shed in the town of Parkfield, located in the southwest corner of Monterey County. Prior to the trial in the present case, defendant was tried separately in Monterey County for the Rambo killing, convicted of murder, and sentenced to serve a state prison term of 33 years to life. In June 1987, while the present case was in trial, the Court of Appeal affirmed defendant's conviction for the Rambo murder (but reversed defendant's additional convictions for conspiracy and methamphetamine manufacturing) in an unpublished opinion. (*People* v. *Garceau* (June 3, 1987) H001539.) His conviction for the murder of Rambo is not before us on this appeal.

Prior to defendant's trial for the Bautista murders, defense counsel informed the prosecution and the trial court that he intended to use the Rambo killing to reinforce the defense theory that one or more of defendant's acquaintances had a motive to murder the Bautistas and Greg Rambo. Thus, the defense had no objection to the prosecutor introducing facts of the Rambo murder in the prosecution's case-in-chief. In his opening statement, defense counsel informed the jury that Rambo had been "murdered." During the trial, the jury heard testimony suggesting that defendant had murdered Rambo, but never was apprised that defendant had been convicted of that offense.

## I. Guilt Phase Evidence

### A. *The prosecution's case*

#### 1. *Overview*

The prosecution's case rested largely on evidence that defendant had, on numerous occasions, confessed his participation in the crimes to acquaintances with whom he had been involved in the manufacture of methamphetamine. According to the prosecution, defendant killed Maureen Bautista because he feared she would "snitch him off" regarding his involvement in methamphetamine manufacturing, and killed her son, Telesforo, because Telesforo had witnessed defendant's lethal attack on his mother. In support of its case, the prosecution presented numerous witnesses who testified to defendant's intense hatred of "snitches" (persons who report illegal activities to third persons) and to defendant's frequent comments, both before and after the Bautista murders, to the effect that "snitches die."

#### 2. *Defendant's methamphetamine manufacturing activity, and his relationship to the victims*

Greg Rambo's surviving spouse, Susan Rambo (who was granted immunity in exchange for her testimony), provided important testimony regarding the principal elements of the prosecution's case. She described defendant's methamphetamine manufacturing activity, which began during the summer of 1984 in a small trailer located behind the Shandon residence that she shared with her husband, Greg Rambo. The trailer was located unobtrusively amidst dog kennels and old, discarded automobiles. The rural, unassuming setting was well suited to the covert operation of a methamphetamine laboratory. Defendant had met the Rambos through a mutual acquaintance, Larry Tom Whittington.

The participants in the drug operation maintained well-defined roles. Susan Rambo served as a lookout. Defendant was the "cook," the person who mixed the chemicals to prepare the methamphetamine (a product that also was referred to by certain witnesses as "speed" or "crank.") Larry Tom Whittington financed the trailer laboratory, provided necessary supplies, and sold the finished product. Greg Rambo cleaned up after the "cook" and also served as a lookout. According to Susan Rambo, Whittington paid her husband, in cash and with methamphetamine, for the use of the trailer.

According to numerous witnesses, defendant frequently "freebased" (i.e., smoked) cocaine. His profit in manufacturing methamphetamine consisted

chiefly of a ready supply of cocaine from Larry Tom Whittington. According to Susan Rambo, Whittington "would supply the cocaine for [defendant], deduct what they owed him for the cook . . . and gave [defendant] money when he needed it."

Susan Rambo testified that defendant prepared his first batch of methamphetamine in the trailer laboratory in August 1984, and prepared four to six subsequent batches that year. Each batch required two to three days to prepare, during which time, according to her, defendant stayed awake, smoking his cocaine pipe. She said defendant freebased cocaine frequently, regardless whether he was manufacturing methamphetamine, and rarely was without cocaine for more than four or five days, when Larry Tom Whittington would replenish defendant's supply.

Larry Tom Whittington, testifying on cross-examination, substantially confirmed Susan Rambo's account of defendant's work habits and cocaine usage, stating that defendant stayed awake throughout each multi-day "cook," and that defendant consumed "a couple of ounces [of cocaine] a week, at least," an expense that, according to Whittington's estimate, cost defendant approximately $4,000 each week. Harlyn Codd testified (on cross-examination) that defendant "could put away an ounce of coke freebasing a day if he had it with him."[3]

Linda Rich, a friend of Maureen Bautista, testified that in the year preceding Bautista's murder, Bautista and defendant had a stormy relationship, punctuated with numerous arguments. She recalled one such quarrel, in April or May of 1984, in which she went to the door of the Bautistas' apartment (which was open, although the screen door was closed), heard the sound of dishes breaking, and observed that a telephone had been "pulled out." On cross-examination, Rich acknowledged that defendant had been kind to Telesforo and had purchased gifts for him, but also that defendant freebased cocaine in the boy's presence.

At the end of August or the beginning of September of 1984, the Bautistas joined defendant, Larry Tom Whittington, and Harlyn Codd on a fishing trip at Lake Isabella. Codd overheard an argument between Maureen Bautista and defendant, in which defendant threatened to kill Maureen because she planned to "snitch" (on the drug operation participants) to Eddie Nash whom, according to Susan Rambo, defendant considered to be his enemy.[4]

---

[3]On cross-examination, Larry Tom Whittington acknowledged that his participation in the Shandon drug operation occurred while he was on bail, pending the appeal of a 1982 conviction for conspiracy to distribute cocaine.

At the time of defendant's trial in 1987, Whittington—his appeal having been unsuccessful—was serving a prison sentence stemming from this 1982 conviction.

[4]Eddie Nash also was known as Edel Nasralla. Because he was referred to at trial as "Eddie Nash," we shall use that name in our opinion.

Susan Rambo testified that Codd had told her Nash was Telesforo's father; also, that Nash once had paid defendant to fulfill a contract but that defendant had failed to perform and, as a result, Nash was "looking for" defendant.

### 3. *The "Nash testimony"*

Over defendant's objection, the trial court permitted the prosecution to introduce the testimony of several witnesses to establish a connection between defendant and Eddie Nash, who was a convicted drug dealer. By this evidence, the prosecution sought to corroborate the testimony of other witnesses that defendant knew Nash, in order to demonstrate that defendant reasonably might have harbored a great fear of Nash because of Nash's violent reputation and prior criminal activities, and generally to support the evidence, noted above, that indicated defendant murdered Maureen Bautista because he feared she would inform Nash of defendant's whereabouts and his drug manufacturing activities.

### 4. *The Bautista murders: defendant's conduct, confessions, and threats*

On September 4, 1984, Maureen and Telesforo Bautista registered at a Bakersfield motel. The motel manager testified that he recalled seeing defendant that afternoon on the premises. On the evening of September 6, Telesforo prepaid in cash for that night's lodging. At a later point that evening, or in the early hours of the next morning, defendant and the Bautistas moved to an unoccupied Bakersfield apartment rented by Patricia Shepard.[5]

Defendant telephoned Larry Tom Whittington near midnight on September 6, asking Whittington to meet him at Shepard's apartment immediately. When Whittington arrived, defendant said he and Maureen Bautista had been arguing loudly at the motel and had been concerned someone would call the police, so he and the Bautistas had moved to Shepard's apartment. Defendant told Whittington he was afraid Maureen was planning to "snitch him off" to Eddie Nash or Nash's attorney; defendant's fear stemmed from his belief

---

[5]Patricia Shepard rarely used this low-rent apartment (which the defense characterized as her "welfare front"), and she and Larry Tom Whittington lived at his residence in Bakersfield. Shepard testified she retained her lease on the foregoing apartment to cover the contingency that she and Whittington (who was married to another woman) might separate. Whittington testified that either he or Shepard had given defendant a key to the apartment, because defendant and Maureen had been fighting.

that Nash was scheduled to be released from prison the following day. When Whittington asked defendant where the Bautistas were, he said they were sleeping in the bedroom. Whittington did not see them, nor did he hear any sounds emanating from the bedroom. He noticed the telephone appeared to have been ripped from the wall.

When Whittington awoke at his Bakersfield residence the next morning, September 7, to the sound of knocking, defendant entered and announced, "I did it. . . . I killed them." Defendant told Whittington that Maureen Bautista "was going to snitch me off [and] I know how to take care of snitches." When Whittington asked defendant to lower his voice so Shepard would not hear the conversation, defendant replied that Shepard should hear what had happened, because the deaths had occurred in her apartment. She thereafter joined the conversation. Both Whittington and Shepard testified that defendant told them he had killed Maureen Bautista and "the kid" the previous evening.

Shepard further testified that defendant stated he had killed the Bautistas by slitting their throats with a knife. She testified that defendant demonstrated to her the manner of stabbing. When she (or Whittington) asked why defendant had killed Telesforo, defendant replied that Telesforo had seen him kill the boy's mother. Defendant told Shepard and Whittington that Telesforo had been afraid of "Jason," the fictional killer depicted in the motion picture "Friday the Thirteenth," but that the boy should have been afraid of defendant instead of "Jason."

A quarter of an hour later, defendant departed from Whittington's Bakersfield residence, informing him that he (defendant) had to leave town, and driving off in Maureen Bautista's automobile, a beige Honda Accord.

Susan Rambo testified that defendant sped into her yard on a Friday morning early in September (September 7 was a Friday), driving Maureen Bautista's automobile. Defendant was "completely erratic, very hyper, babbling, not making sense," and excitedly stated: "They wouldn't believe me. I kept telling them. They wouldn't believe me. They should know what happens to snitches. Now she's dead."

Later that morning, after smoking his cocaine pipe, defendant appeared to calm down and make more sense. Defendant explained that Maureen Bautista had been yelling about "snitches," and that Maureen was going to "snitch" on everyone involved in the drug operation.

Susan Rambo testified defendant told her that when he stabbed Maureen Bautista, Telesforo began screaming hysterically. Defendant told Telesforo

to shut up, and stabbed him when he did not. Defendant explained to Susan Rambo, "You have to take out all witnesses."

Defendant also reminded Susan Rambo she too should be aware of what happens to "snitches": "If you don't want it to happen to you, you know you don't say anything. This is part of the game. This is part of the rules, part of the business. You're in it. You're involved." His threat made her afraid to contact the police, as did additional threats he directed toward her on numerous subsequent occasions regarding "the laws of snitches," his reminders that he killed "snitches," and his habit of arming himself with a gun and a knife.

On that same morning, September 7, Susan Rambo noticed that dark stains had discolored the pants defendant was wearing. Later that day, she observed defendant seated near her washing machine, naked, while the machine was operating.

Wayne James, another acquaintance of defendant, testified that defendant hated "snitches" and had told James that he had killed Maureen Bautista because she was going to "snitch him off," and that her son had walked in while defendant was killing her, so defendant had to "snuff him" too. Defendant told James he had killed the Bautistas by "stab[bing] them and cut[ting] them up with a knife."[6]

### 5. *Disposal of the Bautistas' bodies*

Greg Rambo and Larry Tom Whittington returned to Shepard's apartment on September 7, placed the bodies of Maureen and Telesforo Bautista inside a hollow bedroom dresser, and, on the following day, defendant and Rambo transported the makeshift coffin to the Rambos' residence. Defendant thereafter told Susan Rambo that he and her husband were departing for Los Angeles for the purpose of removing defendant's belongings from Maureen Bautista's apartment, and that if anyone asked about him or Maureen, she should reply by stating that she had not seen them in weeks.

Whittington testified that he and Patricia Shepard returned to Shepard's apartment to scrub off the bloodstains. He testified that he was able to remove the bloodstains, except for those on the carpet, which required repeated efforts at cleaning. Shepard testified, on cross-examination, that she

---

[6]Defense counsel sought to impeach James on cross-examination by eliciting testimony from him that detailed his history of drug usage and sales, his failure accurately to recall Telesforo's name (he testified the boy's name was "Brian"), and his failure to inform the police upon learning of Greg Rambo's murder.

had purchased the carpet cleaner and other materials that were used to clean her apartment following the killings.

After defendant and Greg Rambo departed for Los Angeles, Rambo called his wife and requested that she ask his cousin, Doug Frederick, to obtain a backhoe and dig an eight-foot by ten-foot hole in the Rambos' backyard. Rambo instructed his wife to tell Frederick that the hole was needed for the construction of a new drainage system for the Rambos' dog kennels. Susan Rambo did so.

Doug Frederick testified that he dug the hole on September 6, 7, or 10, 1984; Susan Rambo testified that she awoke on a Monday morning to the sound of a backhoe operating on the property, a circumstance suggesting that Frederick had dug the hole on Monday, September 10. She testified that the hole appeared to be "a couple hundred feet behind the house in the back corner of the lot."

Following defendant's return to Shandon, Susan Rambo noticed the presence of several bags and boxes in her garage, including a computer that defendant had given Telesforo Bautista, a television, a stereo, and some guns. At defendant's request, she purchased cement, bags for the bodies, and a needle to sew up the bags. Defendant told her he intended to place one foot of cement over the Bautistas' bodies. Susan Rambo testified that during the next few days, she observed defendant shoveling dirt into the hole for periods of up to one hour at a time.[7]

### 6. *Defendant's conduct following his entombment of the Bautistas' bodies*

Defendant resided with the Rambos until late November or December of 1984. On numerous occasions during this period, Susan Rambo heard defendant refer to "snitches." Once defendant told her, "You know what happens to snitches," then removed a butcher knife from a magnetic rack on her kitchen wall and, declaring the knife to be "just about right," made several stabbing or slashing motions. She testified that on another occasion, defendant popped open a switchblade knife that "he would play with . . . constantly," and used it to stab a cardboard box that she was carrying. Defendant also told her that the ghost of Maureen Bautista was haunting him.

Susan Rambo testified that defendant moved out of the Rambos' residence in late 1984 to a trailer house on her father's property in Parkfield, where

---

[7]Susan Dalton, a friend of Maureen Bautista, who last had spoken with her on September 2, 1984, reported her missing near the end of that month. Dalton's report was, in part, prompted by her visit to the Bautistas' residence, which she testified had been ransacked. Photographs were scattered throughout the residence, and those depicting defendant were missing. Defendant's clothes were gone. Also missing were Maureen's automobile and stereo and Telesforo's computer.

defendant continued to manufacture methamphetamine in the course of the ensuing few months.

Harlyn Codd testified that in February 1985 he and defendant were watching a violent movie at Codd's residence in Porterville, and that defendant confessed to having committed the Bautista murders. According to Codd, the movie nauseated defendant, who remarked that the film reminded him of what had happened to Maureen Bautista and to "the kid." Defendant stated to Codd that he had "offed" the Bautistas by "cut[ting] them up."

### 7. The murder of Greg Rambo, and the disposal of his body

Although the present appeal does not involve defendant's conviction for the murder of Greg Rambo (see fn. 2, *ante*), the jury heard evidence, summarized below, related to that murder. Much of this evidence was introduced by the defense during its cross-examination of prosecution witnesses, in an effort to undermine the witnesses' credibility by introducing evidence of their odd behavior, complicity, and deception in the aftermath of Greg Rambo's murder.

Susan Rambo testified (on cross-examination) that her husband had pistol-whipped her and placed a handgun to her head on January 23, 1985, because he was angry over her failure to notice a pickup truck that had parked in their backyard. She testified: "He told me he would give me five minutes to get my stuff and get out." The Rambos separated, and Susan went to live with her parents in Parkfield.

Susan Rambo further testified that she last had seen her husband alive on February 19, 1985—on an occasion when he was in a rage. On the following day, defendant telephoned her to say her husband would "never bother her again." She feared defendant's comment meant her husband was dead. Defendant requested that she acquire a tarp or some other object that could be used to dispose of various items (which he did not identify), and she obtained a sleeping bag. Defendant also asked to borrow her father's bulldozer to dig a hole, but her father refused.

Harlyn Codd testified that in February 1985 defendant telephoned him and said, "Greg's dead. I killed him." According to Codd, defendant told him he had shot Rambo three times.[8]

Because Codd was intoxicated at the time of defendant's telephone call, Codd refused defendant's invitation to visit him that day in Parkfield. Codd

---

[8]Leonard Miller, a Tulare County pathologist, testified that Greg Rambo had been shot three times and had died from a gunshot wound to the heart. Miller opined that a gunshot

met defendant the following day, and the two of them went to Parkfield to retrieve Greg Rambo's body from a shed. Codd testified that defendant feared Rambo "was going to be a snitch and he offed him." Rambo's body was wrapped in a sleeping bag and a blanket when Codd saw it.

Resolving to move the body at a later date, defendant and Codd proceeded to defendant's trailer, where defendant freebased cocaine. Codd also ingested cocaine in order to remain awake, because he did not trust defendant.

Codd further testified defendant said he "wanted to cut [Rambo's body] up, stick dynamite in him and blow it up, cut his hands off, knock his teeth out, disfigure him to leave no identification marks or anything . . . so [Rambo] couldn't be identified." Instead, the pair drove to Tulare County, deposited Rambo's body in an orange grove, and returned thereafter to Codd's residence. The following morning, Codd and defendant retrieved Rambo's body, transported it to an isolated section of the county, and dumped it in a ravine known as Deer Creek Canyon. Codd acknowledged selecting the site and on cross-examination stated that after defendant's arrest, he led sheriff's deputies to the spot where he and defendant had dumped the body.[9]

Wayne James testified that at some point after selling defendant a vehicle in February 1985, defendant threw him a spent .38 cartridge, telling James it was the shell that had killed Greg Rambo. Defendant informed James that he and Harlyn Codd had disposed of Rambo's body the previous evening in a ravine located outside Porterville.

On March 3, 1985, in view of Greg Rambo's extended absence from the Shandon residence he had occupied with his wife Susan, she filed a missing person's report with the San Luis Obispo County Sheriff's Department. She testified on cross-examination that despite her awareness (on that date) of evidence suggesting her husband's violent demise, she nonetheless was not certain at that time that he was dead, and simply "did not know where he was." She acknowledged being the beneficiary of her husband's $100,000 life insurance policy, and telling defendant she needed to locate her husband's body in order for her to be able to collect the insurance proceeds.

Susan Rambo also acknowledged that after cleaning up the Parkfield shed that had concealed her husband's body prior to its removal by defendant and

---

wound to the back of the victim's neck had been fired from a distance of only a few inches, and was the last of the three shots.

[9]Defense counsel sought to impeach Codd on cross-examination by eliciting testimony from him that during Codd's initial conversations with sheriff's deputies regarding Greg Rambo's death, Codd failed to mention that defendant had confessed the Bautista murders to him. Codd also admitted that when law enforcement personnel initially asked him whether he knew anything about Greg Rambo's murder, he had lied, denying any such knowledge.

Harlyn Codd, she assisted friends in searching for her husband. She acknowledged telephoning her husband's answering machine several times in the presence of other persons in an effort to fool them into believing she was attempting to locate him. She testified she engaged in the foregoing unusual activity and refrained from calling the authorities, because she feared defendant, Whittington, and Whittington's brother, Bill, each of whom, she said, "carried machine guns and automatic weapons."

### 8. *Defendant's arrest*

Susan Rambo testified that near the end of February 1985, she was "very upset," and defendant told her he did not believe she "was going to hold up in front of questioning or . . . be able to keep up [her] part." She stated that defendant gave her his driver's license, admonishing her: "Here, I want you to be sure and get my name right if you snitch, if you go to the cops." Susan Rambo interpreted defendant's remark—made as his gun lay on the bed near them—as an odd and "rather macho" dare. She replied that she was attempting to stay out of town so as to avoid questions and the possibility of breaking down and becoming a "snitch." Defendant told her he was "ready for the gas chamber . . . ready any time."

On March 6, 1985, Susan Rambo contacted the Kern County Sheriff's Department. Her statements led two days later to the excavation, by law enforcement officials, of two decomposed bodies located inside a dresser buried beneath a layer of cement behind the Rambos' residence. Dental records confirmed that the bodies were those of Maureen and Telesforo Bautista.

Defendant was arrested at a coffee shop in Gorman on March 14, 1985, claiming at the time that his name was Richard Brokaw, a name he had used in registering at a nearby motel. Defendant's wallet contained documents or identification in five names, including his own and that of Greg Rambo. A search by law enforcement officers of defendant's vehicle and motel room resulted in the seizure of several types of ammunition, including three boxes of high power .38-caliber ammunition, loose cartridges, a clip, and shotgun shells.

Shortly after his arrest, defendant telephoned Codd, stating that defendant had been "snitched off" and was "going to get the pill."

### 9. *Physical evidence*

Dr. Karl Kirschner, a forensic pathologist, testified that he conducted autopsies on the Bautistas' bodies on March 9, 1985, one day after law

enforcement officials had exhumed the bodies. He opined that the bodies had been buried for at least four months. Narrow cuts in the victims' clothing suggested that the victims had been stabbed repeatedly. Kirschner testified that the larger body (Maureen's) had been stabbed 11 times in the chest, and he opined the victim had died as a result of those wounds. Because each of the wounds pierced the chest cavity, Kirschner believed "any one of them could have been fatal." Kirschner also stated that while this victim still was alive, she suffered two stab wounds in her jaw. Kirschner testified that the smaller body (Telesforo's) had been stabbed five times in the chest and twice in the back.

Expert witnesses testified that blood spatters identified in Patricia Shepard's corner bedroom were consistent with the infliction of stab wounds and with the victims' blood types, and that the spatters also indicated the presence of commercial detergent products. A bloodstain extending more than five feet across the living room carpet suggested that a bloody body had been dragged across the floor. Carpet fibers found within the dresser were consistent with those obtained from Shepard's apartment.

10. *Defendant's statement, "They can only gas me once"*

Richard Lee, an investigator for the Monterey County District Attorney, testified that on April 4, 1985, defendant, while incarcerated in the Monterey County jail (in connection with the Parkfield murder of Greg Rambo), asked, "So you guys aren't going to try me; is that right?" Lee replied that defendant would be tried in Kern County for the Bautista killings committed in Bakersfield, and in Monterey County for the Rambo killing. Defendant responded, "They can only gas me once. They can only take my wheels one time. Do you know what I mean?" Lee responded, "Come on Bob, that's negative vibes." Defendant laughed and said, "Yeah, negative vibes, that's right. I'm still breathing and there's a few people who ain't." Defendant then laughed again.

B. *The defense case*

The defense sought to establish that participants in the Shandon drug operation, other than defendant, had a financial motive that might have led one or more of them to commit the Bautista murders, as well as the murder of Greg Rambo. With that objective, the defense introduced the testimony of 15 witnesses in an effort to cast doubt upon the credibility of key prosecution witnesses whose testimony had implicated defendant in all 3 murders. In particular, the defense offered testimony aimed at impugning the credibility of Whittington by highlighting his evasive and occasionally contradictory

pretrial testimony. The defense also introduced testimony directed at undercutting Susan Rambo's credibility as a prosecution witness by highlighting her odd behavior in the immediate aftermath of her husband's disappearance. The defense additionally sought to suggest that Susan Rambo might have been involved in her husband's murder, and that her motivation to hasten his demise had been fueled by lust and greed—a desire to pursue an intimate relationship with defendant, and a desire to collect on her husband's life insurance policy.

## II. PENALTY PHASE EVIDENCE

### A. *The prosecution's case*

The prosecution introduced stipulations it had entered into with the defense establishing that defendant had been convicted of second degree burglary in 1972 and possession of a silencer in 1981, both felonies. Over objections of defense counsel, the prosecution also introduced the testimony of witnesses regarding defendant's possession of firearms in 1981 and 1982, and his involvement in an alleged kidnapping that occurred in 1982. We briefly summarize the prosecution's evidence regarding the firearms and the kidnapping.

Douglas Gerst, a police officer employed by the City of Los Angeles, testified that in 1981, during two searches of a residence located in Canoga Park, he recovered numerous weapons, including a Mac Ten machine gun (with silencer), two automatic pistols, six revolvers, six rifles, and twelve shotguns. The prosecution introduced photographs of the machine gun and silencer. Gerst testified that thousands of rounds of ammunition were found inside the residence. Utility receipts established that the premises were defendant's residence.

Diane Sems described an incident in June 1982 in which an acquaintance of hers, Terry Fabricant, forced her into a pickup truck that was driven by another man. Sems was blindfolded, driven to a residence that she did not recognize (and where she observed guns), and forced by Fabricant to ingest drugs. After Fabricant fell asleep a few hours later, she escaped; the next day, no longer under the influence of drugs, she identified the driver of the pickup truck in a police photo lineup. Sems testified that defendant resembled the driver of the pickup truck, although she was uncertain and, in fact, acknowledged on cross-examination that she could not identify the driver.

To bolster Diane Sems's testimony, the prosecution introduced the testimony of Terry Fabricant, who stated that he had been an acquaintance of

defendant's in June 1982 and that defendant drove a pickup truck at that time. Fabricant was not questioned (and did not testify) regarding the facts underlying the alleged kidnapping.

To further corroborate Sems's story, the prosecution introduced the testimony of Philip Quartararol, a police detective employed by the City of Los Angeles. Quartararol testified that he had conducted the photo lineup recalled by Sems, that Sems had identified defendant during that lineup, and that Sems did not appear at that time to be under the influence of drugs. Quartararol also testified that he had obtained a search warrant for the same residence that Officer Gerst had searched one year earlier, and in the ensuing search had recovered two semiautomatic weapons, two shotguns, and several thousand rounds of ammunition. On cross-examination, Quartararol acknowledged that, under the law in effect at the time he conducted the search in 1982, a felon's possession of the firearms he discovered was not illegal, because the weapons were not concealable.

### B. *The defense case*

At the penalty phase, the defense presented evidence in mitigation relating to defendant's prison history, his upbringing and character, and his cordial relationship with a woman and her young daughter.

A document summarizing defendant's prison history indicated that defendant had adjusted well to prison. Defense counsel argued that this document demonstrated that defendant had been a "model prisoner."

The testimony of Russell Garceau, defendant's younger brother, was introduced in an effort to demonstrate positive attributes on the part of defendant as well as the repeated adversity that defendant had faced throughout his life. This testimony indicated that defendant had been an intelligent child, had won poetry and art contests, and was an avid reader. As a youth, defendant developed bone disease in his ankle that required frequent hospitalization and caused defendant to miss "quite a bit of his childhood."

Defendant's brother testified that his father had collected firearms, and when defendant was enrolled in junior high school, defendant had brought a gun to school and then, deciding that was the wrong thing to do, had given it to a school administrator with whom defendant had maintained a good relationship. According to this testimony, defendant was arrested and placed in a detention hall, where he frequently was beaten.

Defendant's brother further testified that at 16 years of age, defendant joined the Army, serving both domestically and in Vietnam, after which he

was honorably discharged in 1968. Upon defendant's return from Vietnam, he seemed embittered and began to commit burglaries, leading to his arrest and imprisonment. Defendant had been proud to be "one of the few [inmates not] involved in violence or dope."

In 1976, defendant rented three or four acres of land in Chatsworth, set up a horse ranch, and attempted to start a hayriding business. Defendant's brother believed that defendant was not involved in criminal activity during the two or three years he lived on the ranch, and that he had not owned any guns during this period. When the land thereafter was sold, defendant was compelled to sell his possessions and leave the ranch.

Defendant's brother further testified that defendant had a generous nature, noting, for example, that "he used to borrow money from me to give to the blind man . . . ." Defendant always had repaid his debts, and made three years of automobile loan payments for the widow of a deceased business partner. Defendant often forgave loans that he had made to others. After his father's death, defendant visited and kept in touch with his mother, who resided in Ohio.

Defendant's brother testified that during the 1980's, defendant "started on drugs . . . that's when I saw his whole personality change . . . . . Up to that time I thought he was probably the most honorable person I had ever met . . . . Then he started getting involved in cocaine and then all of a sudden he wouldn't show up when he was supposed to, he wasn't paying back like he used to pay back his loans and in a sense, to me, became flaky, his whole life seemed to change at that time. . . ."

The defense also introduced the testimony of Starr Calliez, who described defendant as being "very sensitive [and] very considerate." Calliez stated that in 1973, she was an acquaintance of defendant's brother, who mentioned at that time that he had a brother in prison. Calliez began corresponding with defendant, visited him in prison many times, and developed an intimate relationship with him following his release. Calliez stated that defendant was "very friendly and nice" to her six-year old daughter, buying her gifts, and that the three of them engaged in activities as a family. Calliez acknowledged that defendant had not adjusted easily to life outside prison but noted that during their relationship, she never had known defendant to use drugs or resort to violence.

Calliez's close relationship with defendant ultimately ended, and thereafter, in 1983, she married someone else. Calliez was "shocked" to learn of defendant's possible involvement in the illegal activities described at trial.

Notwithstanding the evidence establishing defendant's murder of a mother and a child, Calliez still would feel comfortable in the event she and her daughter were to be alone in defendant's company.

## DISSUSSION

### I. JURY SELECTION ISSUES

#### A. *Alleged Wheeler error*

■ Defendant contends the prosecutor employed peremptory challenges purposefully to exclude Hispanic-surnamed women from the jury, and that the trial court committed prejudicial error in denying defendant's motions for mistrial based upon our decision in *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].

The prosecutor exercised peremptory challenges to remove the following prospective jurors: Sharon Montoya, Dolores Nejera, Jane Chavez, Lucy Martinez, and Hope Vasquez. Immediately following the excusal of Vasquez, defense counsel moved for a mistrial on the ground that the prosecutor improperly had exercised peremptory challenges on the basis of group bias, resulting in the purposeful exclusion of Hispanic-surnamed women. Defense counsel made a second motion for mistrial pursuant to *Wheeler* immediately following the prosecution's exercise of a peremptory challenge against Rita Asuncion, the sixth and sole remaining Hispanic woman on the panel.

The trial court denied the *Wheeler* motions, finding in each instance that defendant had failed to establish a prima facie case of discrimination. (See *People* v. *Wheeler, supra,* 22 Cal.3d at p. 280.)

On appeal, defendant contends that the trial court erred in denying his motions for mistrial. As we shall explain, we reject defendant's argument, because the record supports the trial court's findings that a prima facie case of discrimination was not established.

■ Recently, in *People* v. *Sims* (1993) 5 Cal.4th 405, 428 [20 Cal.Rptr.2d 537, 853 P.2d 992], we restated the applicable law: "Under the principles articulated in *Wheeler, supra,* 22 Cal.3d 258, 276-277, a party may not employ peremptory challenges to remove prospective jurors solely on the basis of group bias. Group bias is a presumption that jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds. (*Wheeler, supra,* 22 Cal.3d at p.

276; *People* v. *Fuentes* (1991) 54 Cal.3d 707, 713 [286 Cal.Rptr. 792, 818 P.2d 75]; see *Powers* v. *Ohio* (1991) 499 U.S. 400 [113 L.Ed.2d 411, 111 S.Ct. 1364].) 'If a party believes an opponent is improperly using peremptory challenges for a discriminatory purpose, that party must make a timely objection and a prima facie showing that the jurors are being excluded on the basis of group bias. [Citation.] To establish a prima facie case, the moving party should first make as complete a record as possible; second, the moving party must establish that the persons excluded are members of a cognizable group; and third, the moving party must show a strong likelihood that the persons are being excluded because of group association.' (*Fuentes, supra,* 54 Cal.3d at p. 714.) Once the moving party has established a prima facie case, the burden shifts to the other party to come forward with a group-neutral explanation for the exercise of the challenges related to the particular case being tried. (*Wheeler, supra,* 22 Cal.3d at pp. 281-282; *Fuentes, supra,* 54 Cal.3d at p. 714.)"

 In the present case, defendant's motions for mistrial were timely made. Also, we assume that defendant is correct in asserting, without challenge by the People, that Hispanic-surnamed women constitute a "cognizable group" under *Wheeler.* (See *People* v. *Clair* (1992) 2 Cal.4th 629, 652 [7 Cal.Rptr.2d 564, 828 P.2d 705]; *People* v. *Motton* (1985) 39 Cal.3d 596, 605-606 [217 Cal.Rptr. 416, 704 P.2d 176] [Black women are a cognizable subgroup]; see also *People* v. *Trevino* (1985) 39 Cal.3d 667, 686 [217 Cal.Rptr. 652, 704 P.2d 719] [Hispanics are a cognizable group for purposes of *Wheeler*], disapproved on another point in *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1219-1221 [255 Cal.Rptr. 569, 767 P.2d 1047].) Nevertheless, defendant failed to show a "strong likelihood" that these prospective jurors were excluded because of a group association. His motions merely reiterated the names of the jurors removed by the prosecution and alleged that, because the removed jurors all were Hispanic-surnamed women, he had made a "prima facie showing."

Thus, the factual context underlying defendant's motions resembled that described in *People* v. *Howard* (1992) 1 Cal.4th 1132, 1154 [5 Cal.Rptr.2d 268, 824 P.2d 1315]. In *Howard,* the defendant relied solely upon the circumstance that the prosecutor's peremptory challenges had been directed toward the only two Black jurors. (*Ibid.*) In this case, as in *Howard,* the defendant "did not make any effort to set out the other relevant circumstances, such as the prospective jurors' individual characteristics, the nature of the prosecutor's voir dire, or the prospective jurors' answers to questions." (*Ibid.*)

 "[W]hen a trial court denies a *Wheeler* motion without finding a prima facie case of group bias the reviewing court considers the entire record

of voir dire. [Citations.] As with other findings of fact, we examine the record for evidence to support the trial court's ruling. Because *Wheeler* motions call upon trial judges' personal observations, we view their rulings with 'considerable deference' on appeal. [Citations.] If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm. [Citation.]" (*People* v. *Howard, supra,* 1 Cal.4th at p. 1155.)

The trial court observed that there were grounds upon which the prosecutor reasonably might have challenged the jurors in question: "Certainly as to Mrs. Vasquez, she repeatedly claimed hardship and was very dissatisfied when I told her she couldn't be excused. I don't see why the People should be required to keep her. . . . I know Mrs. Chavez had medical problems, we had a hard time getting her in, she wanted to be excused. Martinez was very difficult getting her in, Nejera was in her first trimester of pregnancy and Montoya I just don't recall."

The record supports the trial court's denial of defendant's motions. Based upon hardship, Hope Vasquez expressed reluctance to serve as a juror, mentioning a logistical difficulty related to the transportation of her daughter to school and her own travel to court for the trial. Dolores Nejera stated that some members of her family had run afoul of the law and had been incarcerated; one was a fugitive. Sharon Montoya expressed strong reservations relating to the responsibility she would face in the event the trial reached the penalty phase, indicating she did not believe anyone had the right to take the life of another person, and expressed concern based upon having heard of "innocent people being sentenced all the time." Lucy Martinez's contradictory responses to questions presented to her during voir dire examination suggested that she might have difficulty comprehending the questions. Jane Chavez also provided contradictory responses regarding her views on the death penalty, stated that she found the law confusing and probably would forget testimony, and opined that serving as a juror in this case "would be awful." Rita Asuncion, whose removal led to defendant's second *Wheeler* motion, indicated it was difficult for her to understand the concept of reasonable doubt, as well as the distinction between the guilt and penalty phases of the trial.

Defendant contends that the trial court's observations regarding the presence of other Hispanic-surnamed individuals who remained on the panel suggest that its denial of defendant's *Wheeler* motions stemmed from the court's failure to recognize Hispanic-surnamed women as a cognizable class. We disagree. The record is clear that the trial court's denial of defendant's motions for mistrial was based upon its consideration of the individual

jurors' responses on voir dire, and the record is sufficient to support the trial court's conclusion that a prima facie case of discrimination was not established. We conclude the trial court properly found that defendant failed to satisfy the *Wheeler* requirement that he establish a prima facie case of discrimination. (See *People v. Howard, supra,* 1 Cal.4th at pp. 1153-1156; *People v. Hayes* (1990) 52 Cal.3d 577, 605-606 [276 Cal.Rptr. 874, 802 P.2d 376]; *People v. Bittaker* (1989) 48 Cal.3d 1046, 1092 [259 Cal.Rptr. 630, 774 P.2d 659] [prima facie case of discrimination not established where challenged jurors' responses indicated a proper basis for their excusal]; see also *People v. Sims, supra,* 5 Cal.4th at pp. 428-432.)

■ We also reject defendant's claim of federal constitutional error involving his rights to a fair trial and to equal protection of the laws. Having failed to raise the Sixth Amendment claim below, defendant has waived this issue. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1174 [9 Cal.Rptr.2d 834, 832 P.2d 146].) ■ Each claim also is substantively deficient; although defendants have a right to a jury drawn from a fair cross-section of the community, they have no right to a jury that reflects the racial composition of the community. (*Holland v. Illinois* (1990) 493 U.S. 474, 480, 482-483 [107 L.Ed.2d 905, 916, 918, 110 S.Ct. 803]; see also *Taylor v. Louisiana* (1975) 419 U.S. 522, 538 [42 L.Ed.2d 690, 702-703, 95 S.Ct. 692].) ■ Defendant's equal protection claim lacks merit because, as discussed above, the trial court's finding that defendant failed to make a prima facie showing that the jurors were excluded on the basis of group bias is supported by the record. (Cf. *Johnson v. Vasquez* (9th Cir. 1993) 3 F.3d 1327.)[10]

### B. *Alleged wrongful failure to exclude jurors for cause*

■ Defendant contends the trial court improperly denied defense motions to excuse for cause three prospective jurors who possessed views favoring the death penalty that defendant alleges would have impaired their ability to be fair and impartial. The three prospective jurors *never were impaneled,* however, having been excused following defense counsel's exercise of peremptory challenges against them. Defendant nonetheless argues that the trial court's failure to exclude these prospective jurors for cause violated his rights to a fair and impartial jury under the federal and state Constitutions.

■ Both Constitutions guarantee a defendant a trial by an impartial jury. (*Williams v. Superior Court* (1989) 49 Cal.3d 736, 739-740 [263 Cal.Rptr.

---

[10]Throughout this opinion, we shall discuss the merits of particular claims, such as this one, even though they are procedurally barred, when we conclude that such discussion may be helpful in evaluating future claims alleging ineffective assistance of counsel. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1044, fn. 5 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

503, 781 P.2d 537].) ▮ A juror may be challenged for cause based upon his or her views of capital punishment if those views would prevent or substantially impair the performance of the juror's duties in accordance with the court's instructions and the juror's oath. (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844].) ▮ A defendant who claims that the trial court wrongly denied a challenge for cause must demonstrate that his or her right to a fair and impartial jury was affected. (*People* v. *Bittaker*, *supra*, 48 Cal.3d at pp. 1087-1088.)

▮ Defendant fails to make the requisite showing. At the time the jury was sworn, he had *16* peremptory challenges remaining. Thus, defendant cannot demonstrate that his ability to excuse peremptorily any other juror was affected by his decision to exercise peremptory challenges against the three jurors in question. (*People* v. *Raley* (1992) 2 Cal.4th 870, 904-905 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People* v. *Kelly* (1992) 1 Cal.4th 495, 518-519 [3 Cal.Rptr.2d 677, 822 P.2d 385]; *People* v. *Howard* (1988) 44 Cal.3d 375, 419, fn. 17 [243 Cal.Rptr. 842, 749 P.2d 279].)

Because defendant did not exhaust his peremptory challenges, he must justify his failure to do so. (*People* v. *Bittaker*, *supra*, 48 Cal.3d at pp. 1087-1088.) He contends the presence of five *other* "pro-death" persons remaining among the *jury venirepersons on the panel* inhibited defense counsel's exercise of peremptory challenges. We rejected a similar argument in *People* v. *Price* (1991) 1 Cal.4th 324, 401-402 [3 Cal.Rptr.2d 106, 821 P.2d 610], noting that defendant had failed to demonstrate that exhausting his remaining peremptory challenges would have led to the seating of a juror subject to removal for cause. In the present case, if defendant was dissatisfied with the jury as comprised, he could have exercised his remaining peremptory challenges, regardless of the views of venirepersons yet to be impaneled. No error appears.[11]

## C. *Alleged Witt error*

▮ Defendant contends the trial court erred when it dismissed for cause prospective juror Cathy Wilken. During voir dire examination, Wilken

---

[11]Even if defendant's argument were devoid of the procedural deficiencies discussed above, we would find it substantively deficient. The responses of the three prospective jurors, Maria Kinde, Richard Rodriguez, and Jerry Shipman, suggest, at most, the views of persons inclined to impose the death penalty for deliberate killings, but able to set aside such personal beliefs in favor of a careful review of the evidence, guided by the trial court's instructions. Kinde stated during voir dire that she believed the death penalty should be imposed for deliberate and premeditated killings, but also stated that she could be convinced by mitigating evidence to spare a defendant's life. Similarly, although Rodriguez stated that he supported the death penalty as a means of punishment, he also stated that whether or not a death verdict should be imposed would depend upon the circumstances of the case. Finally, although Shipman stated that he favored the death penalty, he also stated that he would consider the evidence and would not hesitate to follow the law.

explained she had a "bias" against the death penalty and did not believe she could vote in favor of a death verdict. Her responses nonetheless were somewhat equivocal; she acknowledged the possibility she could vote in favor of the death penalty. When asked whether she could evaluate penalty phase evidence pursuant to the trial court's instructions and vote in favor of the death penalty if that were the appropriate punishment, however, Wilken replied, "I truly don't know."

In excusing Cathy Wilken, the trial court relied upon *Wainwright* v. *Witt*, *supra*, 469 U.S. 412, in which the United States Supreme Court held that a juror is disqualified from serving in a capital case if his or her views regarding the death penalty would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.* at p. 424 [83 L.Ed.2d at pp. 851-852], fn. omitted.) This court has adopted the *Witt* standard. (*People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].) ▊▊ Our task on review is to determine whether the trial court's finding that the juror's beliefs would "substantially impair the performance" of the juror's duties is fairly supported by the record. (*People* v. *Johnson*, *supra*, 47 Cal.3d at p. 1223 [quoting *Darden* v. *Wainwright* (1986) 477 U.S. 168, 175 [91 L.Ed.2d 144, 153-154, 106 S.Ct. 2464]; see also *People* v. *Cox* (1991) 53 Cal.3d 618, 646-647 [280 Cal.Rptr. 692, 809 P.2d 351]; *People* v. *Daniels* (1991) 52 Cal.3d 815, 875 [277 Cal.Rptr. 122, 802 P.2d 906].)

▊▊ The record supports the trial court's finding. Wilken's responses indicated she was troubled by the prospect of sitting on a penalty phase jury and was uncertain whether she could set aside her bias against the death penalty in favor of weighing the evidence and following the trial court's instructions. Under these circumstances, the trial court properly could find that her views would "substantially impair the performance" of her duties at the penalty phase. Accordingly, no error appears.

### D. *Cumulative effect of assigned errors*

Defendant contends the cumulative effect of the alleged jury-selection errors warrants reversal. In view of our foregoing discussion finding no error, we reject this contention.

## II. GUILT PHASE ISSUES

### A. *Defendant's motion to strike "the Nash testimony"*

At the conclusion of the prosecution's case-in-chief, the defense moved to strike the testimony of prosecution witnesses Eddie Nash, Tony Sylvester,

Ronald Coen, and Michelle Christie (whose collective testimony we refer to as "the Nash testimony"). The motion to strike was made upon relevancy grounds and under Evidence Code section 352.[12] Outside the presence of the jury, the parties argued the relevancy of the evidence, and whether the evidence unfairly sought to establish defendant's "guilt by association" with Nash, a man defense counsel described as "obviously disreputable." The trial court denied the motion to strike, accepting the prosecution's argument that the testimony was relevant to three distinct issues—defendant's motive, defendant's state of mind, and the corroboration of other witnesses' testimony. The trial court found that the evidence was not unduly prejudicial.

On appeal, defendant contends the trial court committed reversible error in denying his motion to strike. Defendant argues this evidence was irrelevant under Evidence Code section 210 and, even if the evidence was relevant, the trial court abused its discretion under Evidence Code section 352 because the probative value of the evidence was substantially outweighed by the possibility it would unduly prejudice defendant. We shall address these contentions in turn.

### 1. The evidence satisfied Evidence Code section 210

The central issue at trial was the identity of the person who fatally stabbed Maureen and Telesforo Bautista. The prosecution sought to establish that defendant had both the motive (fear of "snitches") and the opportunity (time spent alone with the victims, and their trust of him) to commit the murders. The prosecution offered the "Nash testimony" in order to help establish the identity of the killer, insofar as the evidence suggested that: (1) defendant had a motive to kill Maureen; (2) defendant's state of mind could have led him to commit the killings; and (3) the "Nash testimony" corroborated the testimony of other prosecution witnesses. In contrast, the defense theory was that defendant was not the perpetrator of the killings, that he lacked the motive to commit the crimes in view of his close relationship with the victims, and that the killings more likely were committed by a third party, such as Larry Tom Whittington, who was involved in a lucrative drug operation and had no personal relationship with the victims.

In determining the admissibility of the challenged evidence, we apply well-settled rules. Only relevant evidence is admissible. (Evid.

---

[12]Defense counsel had objected on the grounds of relevancy and Evidence Code section 352 prior to the prosecution's direct examination of Tony Sylvester. The trial court overruled the objection. During the prosecution's direct examination of Eddie Nash, defendant objected on the same two grounds to questions pertaining to a dead (allegedly murdered) body found in Nash's home. This objection also was overruled. Defendant also raised relevancy objections at various points during the testimony of Ronald Coen and Michelle Christie, and virtually all of these objections were overruled.

Code, § 350; *People* v. *Babbitt* (1988) 45 Cal.3d 660, 681 [248 Cal.Rptr. 69, 755 P.2d 253].) Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. (*People* v. *Daniels, supra,* 52 Cal.3d at p. 856; *People* v. *Alcala* (1984) 36 Cal.3d 604, 631 [205 Cal.Rptr. 775, 685 P.2d 1126].) The trial court retains broad discretion in determining the relevance of evidence. (*People* v. *Babbitt, supra,* 45 Cal.3d at p. 681.)

The "Nash testimony" was relevant to demonstrate defendant's motive for killing the Bautistas and to establish premeditation, in view of defendant's frequently voiced hatred of "snitches" and his expressed fear that Maureen Bautista would "snitch him off" to Eddie Nash. The "Nash testimony" suggested that defendant's motive in killing the Bautistas was self-preservation—a desire to avoid having Nash, a man with a reputation for violence, learn of defendant's whereabouts and activities. In the absence of physical evidence linking defendant to the Bautista killings, the presence of a motive was particularly significant in this case. (See *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1027-1028 [254 Cal.Rptr. 586, 766 P.2d 1] [evidence of spousal rape charge of which defendant was acquitted held relevant to issue of motive in prosecution for murder of the spouse]; *People* v. *Thompson* (1988) 45 Cal.3d 86, 109 [246 Cal.Rptr. 245, 753 P.2d 37] [motive an important issue where defense asserts that defendant and victim had a good relationship].) We therefore discern no error in the trial court's determination that the "Nash testimony" was relevant.

2. *The "Nash testimony" was not unduly prejudicial*

Defendant contends that even if the "Nash testimony" were relevant, the trial court committed reversible error in failing to exclude it as unduly prejudicial pursuant to Evidence Code section 352.[13] Defendant further contends that, contrary to the admonition contained in numerous decisions of this court (see, e.g., *People* v. *Edelbacher, supra,* 47 Cal.3d 983, 1016-1017, and cases cited), the trial court failed to state on the record that it had weighed prejudice against probative value.

The basis for defendant's motion to strike pursuant to Evidence Code section 352 was his assertion that the prosecution improperly sought to link

---

[13]Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create the substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

defendant with Nash based upon testimony likely to compel the jury to speculate as to defendant's guilt by reason of Nash's illegal activities, reputation, and previous encounters with the law. ■ In opposing the motion, the prosecution relied upon this court's decision in *People* v. *Wright* (1985) 39 Cal.3d 576, 585 [217 Cal.Rptr. 212, 703 P.2d 1106], in which we adopted the following view: " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against . . . [one party] as an individual and which has very little effect on the issues.' " (*Ibid.*, quoting *People* v. *Yu* (1983) 143 Cal.App.3d 358, 377 [191 Cal.Rptr. 859]; see also *People* v. *Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189].) ■ After hearing the parties' arguments as to the alleged probative value and prejudicial effect of the "Nash testimony," the trial court took the matter under submission, noting on the record four days later that it was denying the motion based upon the prosecution's arguments and would consider giving the jury a limiting instruction.[14]

We discern no error in the trial court's ruling. The admission of the "Nash testimony" did present a risk of undue prejudice to defendant in view of Nash's criminal conduct, his violent reputation, and his prior association with defendant. Nevertheless, the danger that the jury might rely upon the "Nash testimony" for an improper purpose (e.g., to conclude that defendant also was a violent individual) was minimized by the trial court's decision to give a limiting instruction. That instruction directed the jury to consider the "Nash testimony" only if it tended to establish the identity and the motive of the perpetrator of the killings, defendant's state of mind at the time of the killings, corroboration of other evidence, or the credibility of any other witness. The instruction directed the jury not to consider the "Nash testimony" as proof that defendant had a bad character or a disposition to commit crimes. Under these circumstances, we conclude that the risk of undue prejudice was not great.

By contrast, the probative value of the "Nash testimony" was considerable, because it bore directly upon the issue of defendant's motive to kill the Bautistas. In light of the testimony that defendant had told others that he feared Maureen Bautista would inform Eddie Nash of defendant's whereabouts, evidence pertaining to Nash's past criminal conduct and violent reputation plainly was of substantial importance in explaining why defendant might have killed a close acquaintance and her son. Moreover, the trial court's limiting instruction rendered it unlikely that the testimony establishing defendant's former association with Nash would evoke an emotional bias

---

[14]Defendant challenges the adequacy of the limiting instruction that the trial court ultimately gave to the jury. We address this argument, *post*, pages 194-195.

against defendant. Although the "Nash testimony" might have been damaging to defendant, it was not unduly prejudicial. (See *People* v. *Karis*, *supra*, 46 Cal.3d at pp. 637-638.)

We conclude that, in admitting the "Nash testimony," the trial court did not abuse its discretion under Evidence Code section 352, because it properly could find that the probative value of the testimony outweighed its prejudicial effect.

Nor do we discern error in the trial court's failure to provide a more precise description of the weighing process it engaged in pursuant to Evidence Code section 352. The parties argued at length the issue of alleged probative value versus prejudice. The trial court, after taking the matter under submission, denied defendant's motion to strike, stating: "The Court accepts the arguments of the People regarding the offer of the testimony. The Court will consider a limiting instruction. . . ." The record, including the trial court's comments, sufficiently establishes that the court weighed and rejected the arguments of defense counsel. (*People* v. *Clair*, *supra*, 2 Cal.4th at p. 660; *People* v. *Edelbacher*, *supra*, 47 Cal.3d at pp. 1016-1017.)

### B. *Defendant's admission*

Defendant contends the trial court erred in permitting Richard Lee to testify regarding his conversation with defendant at the Monterey County jail, during which (according to Lee's testimony) defendant said: "They can only gas me once. They can only take my wheels one time. . . . I'm still breathing and there's a few people who ain't." Defendant argues that Lee's testimony was hearsay and, in the alternative, irrelevant. He further claims that the probative value of the testimony hinged upon unreasonable speculation that his comments to Lee evinced a consciousness of guilt, thereby abridging his right to due process of law under the federal and state Constitutions.

Defendant has waived any claim of error involving the admission of Lee's testimony, by reason of defense counsel's failure to object on the hearsay and relevancy grounds now raised on appeal (or on any other ground, for that matter). (Evid. Code, § 353, subd. (a); *People* v. *Ghent*, *supra*, 43 Cal.3d at p. 766.) Furthermore, even if defendant had raised a timely objection, his claim is substantively without merit, because the jury reasonably could have viewed defendant's statement to Lee—a nonhearsay statement not offered for the truth of the matter asserted—as an implied admission of guilt. (See *People* v. *Miranda* (1987) 44 Cal.3d 57, 83-84 [241 Cal.Rptr. 594, 744 P.2d 1127] [defendant's actions at the time of

his arrest were relevant to establish his consciousness of guilt and his knowledge of the magnitude of the crime], and *People* v. *Mendoza* (1987) 192 Cal.App.3d 667, 675-676 [238 Cal.Rptr. 1] [defendant's statements were not hearsay, because they were not offered for the truth of the matters asserted, but "were properly characterized as admissions since an admission simply is any extrajudicial statement—whether inculpatory or exculpatory—'which tends to prove his guilt when considered with the rest of the evidence'" (quoting CALJIC No. 2.71)].)

## C. *Admission of photographs and physical evidence*

Over the objections of defense counsel, the trial court admitted into evidence a photograph depicting the victims' bodies shortly after they were unearthed, a photograph depicting a superficial depression of Maureen Bautista's sternum, which Dr. Karl Kirschner opined was the result of a knife wound, four small tissue samples taken from the victims, and Maureen Bautista's jawbone, demonstrating a penetrating stab wound. The prosecution offered the foregoing evidence to establish the identity of the victims, to corroborate the prosecution's expert testimony (that the victims had been killed in Patricia Shepard's apartment), and to establish that defendant had acted with malice.

In an effort to preclude admission of the challenged evidence, defense counsel offered to stipulate that Larry Tom Whittington assisted in placing the bodies in the dresser, that Maureen Bautista's death was caused by a blow of considerable force, that the jawbone had comprised part of her anatomy, and that the bodies unearthed were those of Maureen and Telesforo Bautista. After the prosecution rejected the stipulation, the trial court admitted the challenged evidence.

On appeal, defendant challenges the trial court's rulings on three grounds: (1) the evidence was irrelevant; (2) even if relevant, the probative value of the evidence was outweighed by its prejudicial effect, and therefore the evidence should have been excluded under Evidence Code section 352; and (3) the trial court, in exercising its discretion under Evidence Code section 352, failed to engage in a meaningful weighing of probative value against prejudice. Defendant implicitly contends that the trial court should have required the prosecution to accept the proffered stipulation.

The challenged evidence clearly was supportive of the prosecution's theory that the victims had been brutally murdered. (See *People* v. *Wilson* (1992) 3 Cal.4th 926, 937-938 [13 Cal.Rptr.2d 259, 838 P.2d 1212] [photos of murder victim depicting nature and placement of wounds relevant

to prosecution's theory of deliberate killing].) Because the prosecution tried the present case on a theory of premeditated murder, the issue of malice was material, and the photographs and the jawbone were relevant to that issue. (See *People* v. *Hendricks* (1987) 43 Cal.3d 584, 594 [238 Cal.Rptr. 66, 737 P.2d 1350]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 171 [158 Cal.Rptr. 281, 599 P.2d 587]; 2 Witkin, Cal. Evidence (3d ed. 1986) Demonstrative, Experimental and Scientific Evidence, § 837, pp. 801-804.) The tissue samples (extracted from the remains of the exhumed dresser, in which carpet fibers were found consistent with those found in Patricia Shepard's apartment) indicated the probability that the victims had bled in Patricia Shepard's apartment, and therefore were relevant to the prosecution's theory that the killings were deliberate, and that defendant attempted to conceal the crimes by transporting the bodies from the Bakersfield crime scene to the town of Shandon, where the victims surreptitiously were buried.

The evidence in question also was highly probative. The photograph of the mummified victims depicted their positions within the dresser (after the dresser had been unearthed and removed), thereby corroborating Whittington's testimony relating to concealment of the bodies. The photograph illustrating the superficial wound to Maureen Bautista's sternum was offered to establish that defendant employed different degrees of force during the fatal attack, and because the use of force was relevant to the question of malice, the trial court acted within its discretion in determining that the probative value of the photographs clearly outweighed any prejudice that might have been incurred by defendant as a result of their graphic nature. (See *People* v. *Thompson, supra,* 45 Cal.3d at p. 115-116 [no error in admitting photographs of victim's head and ear, through which fatal stab wound was inflicted]; *People* v. *Ruiz* (1988) 44 Cal.3d 589, 612-613 [244 Cal.Rptr. 200, 749 P.2d 854] [no error in admitting "mummy-like" photos of victims].) Introduced as laboratory specimens contained in small jars, the tissue samples were not readily identifiable as human tissue and, as noted, tended to support the prosecution's theory, supported by expert testimony, that the victims were killed in Patricia Shepard's apartment, then transported to Shandon. The appearance of Maureen Bautista's jawbone indicated that her assailant had stabbed her with sufficient force to enable the weapon to penetrate completely through the bone, strongly suggesting that the perpetrator acted with malice. We previously have upheld the admission of body parts over a defense objection similar to that raised in the present case, where the physical evidence is offered in corroboration of expert testimony (and where, presumably, photographs instead could have been utilized). The potentially shocking nature of such physical evidence is not, in itself, a basis for exclusion. (See *People* v. *Thomas* (1992) 2 Cal.4th 489, 524 [7 Cal.Rptr.2d 199, 828 P.2d 101] [admission of teeth and bone fragments].)

Defendant contends the trial court failed to engage in a meaningful weighing process and, instead, mechanically recited that the probative value exceeded the prejudicial effect as to the various exhibits that the defense sought to exclude. With respect to each item of physical evidence challenged on appeal, however, the trial court heard arguments from both sides regarding relevance and prejudice before articulating that the probative value of the challenged evidence outweighed any prejudicial effect. The record indicates that the trial court understood and fulfilled its responsibilities under Evidence Code section 352. Nothing more was required. (See *People* v. *Clair*, *supra*, 2 Cal.4th at p. 660; *People* v. *Griffin* (1988) 46 Cal.3d 1011, 1027-1029 [251 Cal.Rptr. 643, 761 P.2d 103].)

With respect to defense counsel's offer at trial, in an effort to have the actual evidence excluded, to stipulate to certain facts suggested by the challenged evidence, we reiterate the general rule that the prosecution in a criminal case "cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness." (*People* v. *Edelbacher*, *supra*, 47 Cal.3d at p. 1007, and cases cited.) The probative value of the challenged photographs, jawbone, and tissue samples (exhibits that we have reviewed) clearly extended beyond the scope of the defense's offers to stipulate. The prosecution therefore was not obligated to present its case in the sanitized fashion suggested by the defense. (See *People* v. *Pride* (1992) 3 Cal.4th 195, 243 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

Based upon the foregoing, the trial court did not abuse its discretion in admitting the challenged physical evidence. (*People* v. *Thomas*, *supra*, 2 Cal.4th at p. 524; *People* v. *Price*, *supra*, 1 Cal. 4th at p. 441; *People* v. *Ashmus* (1991) 54 Cal.3d 932, 973-974 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

### D. *Sufficiency of the evidence*

At the close of the prosecution's case-in-chief, the defense moved for a judgment of acquittal pursuant to section 1118.1, alleging that the prosecution's evidence was legally insufficient to sustain a conviction. The defense argued that the prosecution's key witnesses—Larry Tom Whittington, Susan Rambo, Patricia Shepard, Harlyn Codd and Wayne James—were accomplices as a matter of law in a drug conspiracy that resulted in the deaths of Maureen and Telesforo Bautista. Based upon the premise that a person cannot be convicted on the uncorroborated testimony of an accomplice (§ 1111), and upon the further premise that one accomplice cannot corroborate another (*People* v. *Clapp* (1944) 24 Cal.2d 835, 837 [151 P.2d 237]), the defense argued that without the testimony of the accomplices, there

would be no evidence supporting defendant's conviction. The trial court rejected these arguments and denied defendant's motion for a judgment of acquittal. In denying this motion, the trial court found that Wayne James was not an accomplice and reasoned that, even if it were to accept defendant's arguments regarding the accomplice status of other prosecution witnesses, James's testimony would provide sufficient evidence of corroboration.

■■■ On appeal, defendant reiterates his contention that his conviction rests upon the uncorroborated testimony of accomplices. As we shall explain, this contention is without merit.

■■■ In order for any one of the foregoing witnesses to have been an accomplice as a matter of law, the record must establish, as a matter of law, either that the witness aided and abetted defendant in committing the killings (§ 31; *People* v. *Gordon* (1973) 10 Cal.3d 460, 468 [110 Cal.Rptr. 906, 516 P.2d 298]) or was involved in a conspiracy in which that person harbored the intent to commit the offense that was the object of the conspiracy. (*People* v. *Marks* (1988) 45 Cal.3d 1335, 1345 [248 Cal.Rptr. 874, 756 P.2d 260].) Neither theory was established as a matter of law by the evidence at trial.

■■■ Patricia Shepard obtained cleaning supplies *after* learning of the killings and helped Larry Tom Whittington scrub the apartment where the killings had been committed. Whittington also helped conceal the victims' bodies. Susan Rambo provided aid in arranging for the victims' grave to be dug in her backyard. Although it is true that a person's post-offense acts are relevant to the issue whether he or she shared the requisite intent prior to the commission of the offense (*People* v. *Brady* (1987) 190 Cal.App.3d 124, 136 [235 Cal.Rptr. 248]), the evidence relating to these witnesses suggests that, at most, they were accessories. (§ 32; *People* v. *Perryman* (1987) 188 Cal.App.3d 1546, 1549 [234 Cal.Rptr. 181].) No evidence connected these witnesses (or anyone else) to the actual killings. Nor did any evidence connect the other alleged accomplices, Harlyn Codd and Wayne James, to the killings or to defendant's subsequent coverup efforts. The aiding and abetting theory therefore fails for lack of evidence that any of the prosecution's witnesses assisted defendant in committing the killings.

Defendant contends that because his drug cohorts were aware of his threats to kill "snitches," they themselves also anticipated the victims' demise. Yet, the record clearly fails to establish, *as a matter of law*, that the killings were a "reasonably foreseeable" consequence of the methamphetamine manufacturing operation conducted on the Rambos' property. It is undisputed that the key prosecution witnesses were part of a *drug* conspiracy, but the evidence does not establish, as a matter of law, that the object of

that conspiracy was the *killing* of Maureen and Telesforo Bautista. Rather, the record discloses only one instance prior to the killings—defendant's conversation with Harlyn Codd at Lake Isabella—in which defendant threatened, in the presence of any key witness, to kill "snitches."[15] That single threat, overheard by Codd, does not demonstrate, as a matter of law, that Codd (or any other prosecution witness) was bound to defendant by a common plan to kill the Bautistas. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 760 [230 Cal.Rptr. 667, 726 P.2d 113] [rejecting notion that a defendant's expression of an intent to kill before a crime necessarily renders the cohort an accomplice to murder].) Defendant's other comments to the key prosecution witnesses regarding "snitches" occurred *after* the killings. Thus, accomplice status cannot properly be accorded the prosecution's witnesses, as a matter of law, on a theory of derivative liability. (See *People* v. *Croy* (1985) 41 Cal.3d 1, 11-12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392].)[16] Accordingly, we find no error in the trial court's denial of defendant's motion for a judgment of acquittal.

### E. *Instructional error*

#### 1. *Special instruction No. 3: other-crimes evidence*

In addition to hearing evidence pertaining to the deaths of Maureen and Telesforo Bautista, the jury received evidence pertaining to defendant's illegal drug activity and the murder of Greg Rambo. The parties proposed instructions regarding the purposes for which the jury could consider this evidence of defendant's other crimes.

The prosecution submitted special instruction No. 3, set forth in the margin.[17] The instruction was broadly written, directing the jury to consider the other-crimes evidence for numerous purposes, including defendant's "character or any trait of his character." Outside the presence of the jury, the

---

[15]Codd testified that defendant and Maureen "were freebasing and they were having an argument of some type . . . . He kept talking about how he was going to get rid of her, see, because she was snitching us off."

[16]For the reasons set forth in the above discussion, the trial court properly rejected defendant's request that the jury be instructed pursuant to California Jury Instructions, Criminal (4th ed. 1979) (hereafter CALJIC) No. 3.16, which would have informed the jury that one (or more) of the prosecution's witnesses was an accomplice *as a matter of law*.

[17]The prosecution's special instruction No. 3 provided:

"Evidence has been introduced for the purpose of showing that the defendant committed other crimes other [*sic*] than that for which he is on trial.

"Such evidence, if believed, may be considered by you for any purpose, including but not limited to any of the following:

"His character or any trait of his character;

"His conduct on a specific occasion;

prosecutor argued that the jury should be allowed to consider evidence, such as that pertaining to the murder of Greg Rambo, bearing upon defendant's character, because the defense had indicated at the outset of the case that it would not object to the introduction of such evidence.

The defense objected to the prosecution's proposed special instruction No. 3, arguing that it was overbroad, impermissible in view of Evidence Code section 1101's proscription against the use of character evidence to prove conduct, and premised upon a mischaracterization of the defense's stipulation regarding the prosecution's use of other-crimes evidence. The defense proposed instead that the trial court instruct the jury pursuant to CALJIC No. 2.50, set forth in the margin.[18] This instruction would have limited the jury's consideration of the other-crimes evidence to establish motive or the existence of a conspiracy. It expressly would have prohibited the jury from considering such evidence to demonstrate that defendant had a bad character or a disposition to commit crimes.

After hearing the parties' arguments, the trial court rejected the defense request that the court instruct pursuant to CALJIC No. 2.50, ruling instead that it would give the prosecution's special instruction No. 3.

On appeal, defendant contends he was denied his right to due process of law when the trial court instructed the jury regarding other-crimes evidence pursuant to special instruction No. 3. Specifically, defendant characterizes as erroneous that portion of the instruction specifying that evidence

---

"A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case which would further tend to show:

"The existence of any element of the crimes charged;

"The identity of the person who committed the crimes, if any, of which the defendant is accused;

"That the defendant had knowledge of the nature of the things found in his possession;

"That the defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged.

"You must weigh such evidence as you do all other evidence in this case."

[18]CALJIC No. 2.50, as modified by the defense, would have provided:

"Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial.

"Such evidence, if believed, was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes.

"Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show:

"A motive for the commission of the crime charged; or,

"The existence of a conspiracy.

"For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you would do all other evidence in the case.

"You are not permitted to consider such evidence for any other purpose."

of other crimes, "if believed, may be considered by [the jury] *for any purpose, including but not limited to any of the following:* [¶] [*Defendant's*] character or any trait of his character. . . ." (Italics added.) In response, the People concede that the italicized portion of the instruction was overbroad, but argue that the reliability of defendant's trial was not undermined by the giving of this instruction.

Notwithstanding the parties' agreement at the outset of the case to allow the admission of evidence pertaining to the murder of Greg Rambo, it is clear the trial court erred in giving the italicized portion of special instruction No. 3. Subject to certain exceptions inapplicable here, evidence pertaining to a defendant's character is inadmissible when offered to prove the defendant's conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).)

In the present case, the italicized portion of the challenged instruction impermissibly invited the jury to consider certain evidence (e.g., that defendant killed Rambo) for the purpose of establishing defendant's propensity to commit murder. Assuming the jury considered such evidence in that context, the jury arguably might have inferred that because defendant had killed Rambo, defendant also was capable of killing other friends, such as Maureen and Telesforo Bautista. If the jury drew that inference, the prosecution's burden of proof as to the central issue in the case, the identity of the Bautistas' slayer, arguably was lightened, thus raising the possibility that defendant's constitutional right to due process of law was impaired. Because the People contend, under these circumstances, that the error is harmless under the state harmless-error analysis (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]), as well as under the more exacting federal standard, which requires us to analyze whether the trial court's error was harmless beyond a reasonable doubt (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]), we shall assume, without deciding, that the *Chapman* standard is applicable. (Cf. *Arizona* v. *Fulminante* (1991) 499 U.S. 279 [113 L.Ed 302, 111 S.Ct. 1246] [federal constitutional "trial error," such as admission of an involuntary confession, is subject to the harmless-error analysis set forth in *Chapman*].)

In ascertaining the effect of the trial court's error, we consider the potentially devastating impact of other-crimes evidence that permits the jury to conclude that a capital defendant has a propensity to commit murder. Such evidence invites the jury to be swayed by speculation that, because the defendant previously has murdered, he or she also committed the charged murder. (See *Michelson* v. *United States* (1948) 335 U.S. 469, 475-476 [93 L.Ed. 168, 173-174, 69 S.Ct. 213]; *People* v. *Smallwood* (1986) 42 Cal.3d 415, 428 [228 Cal.Rptr. 913, 722 P.2d 197].) Thus, such evidence is

inadmissible to establish a defendant's criminal disposition, but is admissible when relevant to another issue, such as opportunity or intent. (See *People v. Miranda, supra,* 44 Cal.3d 57, 82; see also *Estelle v. McGuire* (1991) 502 U.S. __ [116 L.Ed.2d 385, 399-402, 112 S.Ct. 475, 483-484] [jury instruction relating to prior-injury evidence did not constitute a "propensity instruction"].)

Unlike the more typical situation, the present case involves other-crimes evidence that was *not* introduced over the objection of the defense, but rather *at its invitation.* The defense sought to include such evidence in an effort to persuade the jury of the likelihood that some other member of the drug conspiracy killed Greg Rambo and the Bautistas. This circumstance undoubtedly diluted the probative value of the other-crimes evidence for the prosecution's case, because it was clear the defense desired that the jury consider this evidence for the purpose of establishing defendant's innocence of the charged offenses.

We weigh the foregoing impact against defendant's damning trail of incriminating statements and the circumstantial evidence linking him to the Bautista murders. Larry Tom Whittington, Patricia Shepard, Susan Rambo, and Wayne James each testified as to defendant's confessions. The prosecution presented testimony (of Larry Tom Whittington) that placed defendant at the crime scene on the night of the killings, that established defendant had been arguing with Maureen Bautista, and that defendant had feared she would "snitch him off"; the victims were killed in brutal fashion according to the witnesses who related defendant's confessions—testimony corroborated by the prosecution's forensic testimony, and defendant subsequently went to extreme lengths to conceal the murders, including the removal of his personal effects (and photographs depicting him) from the Bautistas' residence, transportation of the bodies from Bakersfield to Shandon, and burial of the Bautistas' bodies beneath a layer of freshly poured cement. Six days after law enforcement officials exhumed the bodies, defendant falsely identified himself to the officer who arrested him. Viewed against such overwhelming evidence establishing defendant's guilt of the charged offenses, the challenged section of special instruction No. 3, allowing the jury to consider the other-crimes evidence to establish defendant's character, led to a cumulative rather than an unduly prejudicial use of the evidence. We therefore conclude that the trial court's error was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711].)

### 2. *Accomplice liability*

Defendant contends the trial court committed reversible error when it instructed the jury pursuant to 20 standard jury instructions relating to the

subjects of accomplice testimony and conspiracy. Defendant's contention rests upon three distinct arguments: (1) the trial court's instructions represented a "chaotic array" that confused the jury; (2) the trial court misread two instructions; and (3) the trial court erred in rejecting defense counsel's request for a special instruction pertaining to the testimony of an informer.

### a. *The standard instructions were not confusing*

The trial court instructed the jury pursuant to CALJIC Nos. 2.27, 3.10, 3.11, 3.12, 3.13, 3.14, 3.18, and 3.19, which addressed the matter of accomplices, and CALJIC Nos. 6.10.5, 6.11, 6.12, 6.13, 6.14, 6.16, 6.17, 6.18, 6.19, 6.20, 6.21, and 6.22, which addressed the subject of conspiracy. Pursuant to CALJIC No. 17.31, the jurors were instructed that not all instructions necessarily were applicable.

Defendant's argument that the foregoing instructions confused the jury is based upon several contentions, none of which has merit. First, defendant contends the conspiracy instructions were deficient because *he* was not charged with conspiracy, the instructions thus leaving the jury confused as to what conspiracy could be found. This contention ignores both the evidence at trial suggesting the presence of a drug conspiracy, and the defense theory that the killings were a foreseeable result of that conspiracy. Second, defendant contends the trial court failed to tailor the conspiracy instructions to "conform" to the case, instead allowing the jury to "roam without guidance." Yet this argument ignores both the comprehensive nature of the conspiracy instructions given and the particular instruction to the jury that it should disregard any instruction that applied to facts that the jury determined did not exist. Third, defendant contends the trial court confused the jury by giving instructions on aiding and abetting. Such instructions clearly were proper, however, in view of the evidence that other individuals participated in concealing the murders, thereby raising the possibility that one or more persons might have assisted the killer in perpetrating these crimes.

Defendant also contends the trial court confused the jury by instructing them pursuant to CALJIC No. 6.20 (withdrawal from conspiracy), even though there was no evidence that any conspirator had withdrawn from the conspiracy. This argument must fail because the presence of a conspiracy was a jury question necessarily embracing issues of who participated in the Shandon drug operation, and when that participation occurred. Moreover, because defendant moved his drug operation from Shandon to Parkfield in December of 1984, a factual issue existed as to whether the Shandon drug conspiracy existed after that move.

Defendant contends the trial court confused the jury in refusing to modify CALJIC No. 6.22, which instructed the jury, in pertinent part, that "Each person in this case is individually entitled to, and must receive, your determination whether he was a member of the alleged conspiracy." Defendant sought to substitute the names of the five key prosecution witnesses for the words "[e]ach person." Defendant's requested substitution obviously would have unduly limited the jury's consideration of who might have participated in the drug conspiracy.

The giving of the accomplice and conspiracy instructions was justified on the basis of the defense's theory that the deaths of Maureen and Telesforo Bautista were the foreseeable result of a conspiracy involving prosecution witnesses. Whether any witness was a member of a conspiracy, whether the murders were a foreseeable consequence of a conspiracy, and whether any witness required corroboration because he or she was an accomplice to the killings were factual matters properly left for the jury's determination. Viewed singularly or collectively, the standard instructions given by the trial court were not confusing. Moreover, any theoretical possibility of confusion was diminished by the parties' closing arguments: defense counsel argued that corroboration was required because the key prosecution witnesses were conspirators, and the prosecution emphasized that the People had shown corroboration if it was needed. There is no indication in the record that. the jury sought clarification of the instructions challenged on appeal. We therefore reject defendant's argument that the trial court's instructions confused the jury.

b. *The trial court's misreading of CALJIC Nos. 3.19 and 6.10.5 constituted harmless error*

In instructing the jury pursuant to CALJIC No. 3.19 (burden to prove corroborating witness is an accomplice), the trial court failed to read the full instruction, the fourth paragraph of which provided: "In the event that the defendant has not proved by a preponderance of the evidence *that any witness is an accomplice or the evidence* is evenly balanced so that you are unable to say that the evidence on either side of the issue outweighs the other, then you must find that such witness was not an accomplice." The court inadvertently omitted reading the italicized portion of the instruction.

Defendant contends the trial court's error in rendering an incomplete version of CALJIC No. 3.19 violated his right to due process of law. We disagree. The error was harmless, because the jury received the correct version of CALJIC No. 3.19 in its written form. (See *People* v. *Andrews* (1989) 49 Cal.3d 200, 216 [260 Cal.Rptr. 583, 776 P.2d 285]; see also

*People* v. *Heishman* (1988) 45 Cal.3d 147, 163-165 [246 Cal.Rptr. 673, 753 P.2d 629] [trial court's omission of the word "not" from the same sentence in CALJIC No. 3.19 held to be harmless].)[19] Moreover, the trial court's misreading could not have been prejudicial in light of the other instructions given. (See *People* v. *Ghent, supra*, 43 Cal. 3d at p. 763.)

CALJIC No. 6.10.5 defines conspiracy and explains that, in order to find that a defendant was a member of a conspiracy, there must be proof of an unlawful agreement, specific intent to commit a public offense, and proof of the commission of at least one overt act for the purpose of accomplishing the object of the agreement. Prior to the giving of the instructions, the court agreed to tailor the language in this instruction by replacing the reference to "defendant" with the word "persons." In instructing the jury pursuant to CALJIC No. 6.10.5, however, the trial court stated, in pertinent part, that "In order to find *a person* to be a member of a conspiracy, in addition to proof of the unlawful agreement and specific intent, there must be proof of the commission of at least one overt act." Thus, as given by the trial court, the instruction failed to reflect precisely the modification discussed with counsel.

Defendant's contention that the trial court's error violated his right to due process of law is without merit. This technical error did not render the instruction inconsistent with the defense theory of the case, nor did it impermissibly restrict the jury in determining whether *any* person was a conspirator. (See *People* v. *Lyons* (1958) 50 Cal.2d 245, 271 [324 P.2d 556].) No prejudice appears.

 c. *Special instruction A: testimony of an informant*

■ Defendant contends the trial court erred in refusing to instruct the jury pursuant to special instruction A, which would have cautioned the jury to examine with greater care the testimony of an informer.[20] This instruction was patterned upon the federal rule that requires the giving of a cautionary instruction regarding the testimony of an informant when that testimony furnishes the only strong evidence of guilt. (*United States* v. *Patterson* (9th Cir. 1981) 648 F.2d 625, 630-631.) Defendant contends the giving of this

---

[19]The current version of CALJIC No. 3.19 omits the sentence here at issue. (CALJIC (5th ed.) No. 3.19.)

[20]Special instruction A provided:

"The testimony of an informer who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the informer's testimony has been affected by interest, or by prejudice against defendant." (Citing Devitt & Blackmar, Federal Jury Practice and Instructions (3d ed. 1977) § 17.02.)

instruction was required because the prosecution's case relied upon the testimony of five witnesses who stated that defendant had confessed to the murders.

The federal rule supporting defendant's proposed instruction differs from the law applied in California's state courts. (Evid. Code, § 411;[21] *People* v. *Alcala, supra,* 36 Cal.3d at p. 623.) This court previously has upheld the refusal to give a similar, cautionary instruction regarding the trustworthiness of an immunized witness's testimony. (*People* v. *Hunter* (1989) 49 Cal.3d 957, 977-978 [264 Cal.Rptr. 367, 782 P.2d 608]; see also *People* v. *Payton* (1992) 3 Cal.4th 1050, 1059 [13 Cal.Rptr.2d 526, 839 P.2d 1035] [rejecting claim that trial court erred in failing to instruct on its own motion that testimony of a jailhouse informant "should be viewed with suspicion and distrust"]; *People* v. *Castro* (1979) 99 Cal.App.3d 191, 196-197 [160 Cal.Rptr. 156] [appellate court rejected instruction identical to that proposed here].) The jury in the present case received adequate standard instructions on the credibility of witnesses. (CALJIC Nos. 2.20, 2.21, 2.22, 2.23.) The trial court therefore did not err in refusing to give the special instruction requested by the defense.

> 3. *The trial court's refusal to instruct the jury pursuant to the defense's special instructions pertaining to reasonable doubt and the need to view with caution the testimony relating to defendant's confessions*

Defendant contends the trial court committed reversible error in rejecting special instructions, submitted by the defense, pertaining to the reasonable doubt standard of proof and the need to view with caution the testimony relating to defendant's confessions. As we shall explain, we reject defendant's argument.

> a. *Special instruction D: reasonable doubt*

Defense counsel proffered special instruction D (set forth in fn. 22), directing the jury to consider specific evidentiary issues in determining the existence of reasonable doubt as to the identity of the Bautistas'

---

[21]Evidence Code section 411 provides:

"Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact."

Enacted subsequent to the present trial, and therefore inapplicable here, section 1127a, subdivision (b), prescribes that, upon the request of a party, the trial court shall instruct that " 'The testimony of an in-custody informant should be viewed with caution and close scrutiny. . . .' "

killer.[22] The prosecutor objected on the ground that the instruction was argumentative. Following argument by counsel, the trial court refused the requested instruction, observing that it would confuse the jury and, "for the most part, it is argumentative."

The trial court's ruling was correct. In *People* v. *Wright* (1988) 45 Cal.3d 1126, 1135-1138 [217 Cal.Rptr. 212, 703 P.2d 1106], we rejected a special instruction that similarly pinpointed specific evidence rather than a particular theory of the defendant's case. (See also *People* v. *Daniels, supra,* 52 Cal.3d at pp. 870-871; *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1020-1021 [245 Cal.Rptr. 185, 750 P.2d 1342]; *People* v. *Adrian* (1982) 135 Cal.App.3d 335, 338 [185 Cal.Rptr. 506].) Such an instruction properly is refused as argumentative because it "would invite the jury to draw inferences favorable to the defendant from specified items of evidence on a disputed question of fact, and therefore properly belongs not in instructions, but in the arguments of counsel to the jury." (*People* v. *Wright, supra,* 45 Cal.3d at p. 1135; *People* v. *Farmer* (1989) 47 Cal.3d 888, 914 [254 Cal.Rptr. 508, 765 P.2d 940].) To the extent that special instruction D could be read to embrace

---

[22]Defendant's special instruction D provided:

"In determining whether reasonable doubt exists as to whether someone other than Mr. Garceau killed Maureen and Telesforo Bautista, you may consider any of the following evidence:

"In whose apartment were they killed?

"Who moved the bodies?

"Who cleaned up the apartment and removed the bodies?

"Whose vehicle was used to move the bodies?

"At whose property were they buried?

"Who had a motive to kill them?

"Who benefitted from their death?

"Who lied to the police about their deaths?

"Who withheld information from the police about their deaths?

"Who arranged for digging the hole in which they were buried?

"Who purchased the cement to cover the bodies?

"Who knew where Maureen's car was hidden?

"Who received immunity to testify?

"Who was seen by neighbors carrying the bodies?

"Who lied under oath in court?

"What is the relationship between all those people who say Mr. Garceau confessed to them?

"Who filed false reports in Greg Rambo's death?

"Who called Greg Rambo's phone asking for him, although knowing he was dead?

"Who had Greg Rambo's wallet, knives and tapes *immediately after his death?*

"Who had guns last seen with Greg Rambo immediately after Greg Rambo's death?

"Who benefits from having Robert Garceau blamed for the killings of Maureen and Telesforo Bautista and Greg Rambo?

"Whose vehicle was used to move Greg Rambo's body?

"Who decided where to leave Greg Rambo's body?

"The length of the delay between alleged statements by Garceau and the reporting of those statements by the people who say he made them."

stated principles of law involving reasonable doubt, it was repetitious of other instructions given, notably CALJIC No. 2.90, which this court has recognized as "the best available definition of the standard of proof beyond a reasonable doubt." (*People* v. *Crandell* (1988) 46 Cal.3d 833, 881 [251 Cal.Rptr. 227, 760 P.2d 423]; see also §§ 1096, 1096a.) The giving of special instruction D therefore would have confused the jury, and properly was refused on that ground as well. (*People* v. *Farmer*, *supra*, 47 Cal.3d at p. 913.)

b. *Special instruction F: viewing with caution the testimony related to defendant's confessions*

Defense counsel proffered special instruction F (set forth in fn. 23), directing the jury to view with caution the testimony relating to defendant's confessions, and focusing upon specific evidentiary factors relevant to the prosecution witnesses who testified that defendant confessed to committing the Bautista murders.[23] The prosecutor objected on multiple grounds, among them that the instruction was duplicative and argumentative. The trial court declined to instruct the jury pursuant to special instruction F, ruling that the instruction was objectionable on the latter two grounds.

The trial court's ruling was correct. Special instruction F improperly selected certain evidence and implied the weight to be derived therefrom,

---

[23]Defendant's special instruction F provided:

"Confession testimony to be viewed with caution.

"Confession testimony has been received in this trial for the purpose of identifying the defendant as the person who committed the crimes charged. The law recognizes that confession testimony is not always reliable, and that cases of false testimony about confessions have been known to occur. You should therefore view confession testimony with caution, and evaluate it carefully in light of the factors I shall discuss.

"Factors to consider in determining credibility of confession testimony[:]

"Many factors can affect the accuracy of confession testimony. In determining the weight to be given the confession testimony in this case, you should first consider the factors I have previously mentioned that may affect confession testimony. (Some are known to you from your personal experiences, while others have been the subject of scientific study and proof.)* Among the more important factors to consider are the following:

"How long did the witness take to report the alleged confession? Did a witness give a report of the confession immediately after the confession was allegedly made?

"Did the witness have a motive to place the blame on the person allegedly confessing?

"Was the witness connected to the crimes by incriminating evidence?

"Was the defendant connected to the crimes by any evidence other than the alleged confession?

"Was the witness granted immunity, or given any other promise or inducement to testify?

"Did the witness stand to gain financially by placing the blame on the defendant?

"[Citation.]"

*In his argument to the trial court, defense counsel offered to eliminate that portion of the proffered instruction enclosed in parentheses.

thus creating the same type of argumentative instruction disapproved in *People* v. *Wright, supra,* 45 Cal.3d at pages 1135-1138. The instruction also was repetitious of the standard cautionary instructions given to the jury in this case (CALJIC Nos. 2.70 and 2.71.7)[24] and therefore properly was refused. (See also *People* v. *Farmer, supra,* 47 Cal.3d at p. 913.)

 4. *The trial court's refusal to instruct the jury pursuant to special instruction H regarding the "Nash testimony," and its decision instead to instruct pursuant to the prosecution's special instruction No. 1*

In denying defendant's motion to strike the "Nash testimony," the trial court indicated it would "consider a limiting instruction to the jury. . . ." Both parties thereafter submitted their proposed special instructions pertaining to the admissibility of the "Nash testimony."

Defense counsel proffered special instruction H (set forth in fn. 25), directing the jury to view the "Nash testimony" only as it might relate to motive.[25] In response, the prosecutor argued the superiority of its special instruction No. 1 (set forth in fn. 26), which paralleled a modified version of CALJIC No. 2.50 upheld in *People* v. *Contreras* (1983) 144 Cal.App.3d 749,

---

[24]CALJIC No. 2.70, as rendered by the trial court, provided:

"A confession is a statement made by a defendant other than at his trial in which he has acknowledged his guilt of the crimes for which he is on trial. In order to constitute a confession, such a statement must acknowledge participation in the crimes as well as the required criminal intent.

"A statement made by a defendant other than at his trial is not a confession, but an admission, whenever the statement does not, by itself, acknowledge his guilt of the crime for which he is on trial, but which tends to prove his guilt when considered with the rest of the evidence.

"You are the exclusive judges as to whether the defendant has made a confession or an admission and if so whether such statement is true in whole or in part. If you should find that a defendant did not make the statement, you must reject it. If you find it true in whole or in part, you may consider that part which you find to be true.

"Evidence of an oral confession or oral admission of the defendant should be viewed with caution."

CALJIC No. 2.71.7, as rendered by the trial court, provided:

"Evidence has been received from which you may find that an oral statement of intent, plan, motive, or design was made by the defendant before the offense with which he is charged was committed.

"It is your duty to decide whether such statement was made by the defendant.

"Evidence of an oral statement ought to be viewed with caution."

[25]Defendant's special instruction H provided: "The testimony regarding Eddie Nash, if believed, is only to be considered by you insofar as it relates to a possible motive. It is improper to find a person guilty of any offense based on guilt by association."

755-758 [192 Cal.Rptr. 810, 39 A.L.R.4th 764] (evidence of gang membership).[26] The trial court indicated that special instruction No. 1 would be given, and that special instruction H was refused "as being adequately covered in [s]pecial [i]nstruction No. 1."

 Defendant contends the trial court committed reversible error in refusing to instruct pursuant to special instruction H and in giving instead special instruction No. 1. Defendant argues that special instruction H properly countered the prosecution's attempt to establish defendant's guilt through his association with Nash. Defendant further argues that special instruction No. 1 failed effectively to limit the jury's consideration of the "Nash testimony."

We reject defendant's arguments. Defendant's special instruction H was unduly limiting because, as discussed earlier, the "Nash testimony" was relevant not only to the matter of motive, but to the killer's identity and state of mind, and also provided corroboration of other testimony that suggested defendant had been associated with Eddie Nash.

Special instruction No. 1 properly allowed the jury to consider the "Nash testimony" for any of the foregoing valid purposes. The instruction also protected defendant by explicitly precluding the jury from considering the "Nash testimony" "to prove that defendant is a person of bad character or that he has a disposition to commit crimes." Such protection was both broader and clearer than the amorphous charge—set forth in defendant's special instruction H—that "[i]t is improper to find a person guilty of any offense based on guilt by association." We discern no error.[27]

---

[26]The prosecution's special instruction No. 1 provided:

"Evidence has been received concerning the character and reputation of another witness, Ed Nash, and of defendant's association with that witness. Such evidence, if believed, was not received and may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. Such evidence was received and may be considered by you only for the limited purposes of determining if it tends to show:

"The identity and motive of the person who committed the crimes, if any, of which the defendant is accused;

"The defendant's state of mind at the time of the crimes charged;

"Corroboration of any other evidence;

"Credibility of any other witness.

"For the limited purposes for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.

"You are not permitted to consider such evidence for any other purposes."

[27]In view of our holding that the trial court properly instructed the jury with regard to the limited admissibility of the "Nash testimony," we need not, and do not, reach defendant's alternate contention that the trial court's ruling was prejudicial to defendant at the penalty phase of his trial.

### 5. *Special instruction G: voluntary intoxication*

■ Defendant contends that the trial court committed reversible error in refusing to instruct the jury pursuant to defendant's special instruction G (set forth in fn. 28), which would have directed the jury to consider the effect of intoxication upon defendant's mental state.[28] The instruction was a modified version of CALJIC Nos. 4.21 and 8.77.

At trial, defendant argued that the instruction was warranted on two grounds. First, defendant argued that there was sufficient evidence of defendant's voluntary intoxication to require that the jury be instructed on this subject. Second, even if there was insufficient direct evidence to warrant the giving of this instruction, other evidence establishing defendant's habitual cocaine usage supported an inference that, because defendant freebased cocaine during the morning shortly *after* the Bautistas were killed, he would have been freebasing cocaine during the evening (or early morning) when these crimes were committed. In response, the prosecution argued that the evidence was insufficient to justify the giving of defendant's proffered special instruction, and that the instruction was inconsistent with the third-party-culpability defense presented by the defendant.

After considering the parties' arguments, the trial court rejected special instruction G on the basis that "there is not sufficient evidence regarding voluntary intoxication at the time of the alleged homicide. For the jury to be instructed on that aspect, it would be inviting the jury to speculate and the Court deems that to be inappropriate." The trial court further ruled that defense counsel would not be permitted to argue to the jury that defendant's voluntary intoxication at the time of the killings could negate the mental state required to establish first degree murder. The trial court, indicating it would allow argument as to whether defendant's cocaine usage had a bearing upon whether defendant did in fact act with premeditation and

---

[28]Defendant's special instruction G provided:

"If you find from the evidence that at the time the alleged crime was committed, the defendant was intoxicated, you must consider what effect, if any, it had on the defendant's forming any of the specific mental states that are essential elements of murder.

"Thus, if as a result of that intoxication you have a reasonable doubt whether he did, maturely and meaningfully, premeditate, deliberate, and reflect upon the gravity of his contemplated act, you cannot find him guilty of a willful, deliberate and premeditated murder of the first degree.

"Also, if as a result of that intoxication you have a reasonable doubt whether he formed the mental states constituting either express or implied malice aforethought and the intent to kill, you cannot find him guilty of murder of either the first or second degree.

"If from all the evidence you have a reasonable doubt whether defendant formed such specific intent and mental state, you must give the defendant the benefit of that doubt and find that he did not have such specific intent and mental state."

deliberation, stated that defense counsel could argue "the cumulative effect of using cocaine over a period of time[,] should the jury consider whether that had any bearing on [defendant's] conduct."

On appeal, defendant challenges the trial court's finding that there was insufficient evidence to warrant the giving of special instruction G. Defendant cites the testimony of witnesses who described his prodigious use of cocaine. He also links the testimony of Harlyn Codd, who stated that defendant would become paranoid when engaged in freebasing cocaine, with the testimony of Larry Tom Whittington, who stated that defendant appeared to be exhibiting signs of paranoia when Whittington visited defendant at Patricia Shepard's apartment on the night of the killings. Defendant also links Susan Rambo's testimony that defendant was "hyper" when he freebased cocaine, with her testimony that defendant was "very nervous, hyper, very excited" when he sped into her backyard in September of 1984 and confessed the killings to her. According to defendant, the collective testimony of Codd, Whittington, and Susan Rambo establishes an inference that defendant must have been using cocaine at or shortly before the time of the killings.

We disagree with defendant's characterization of the evidence. There was no evidence introduced at trial that defendant had ingested cocaine at or shortly before the time of the killings. Moreover, Susan Rambo and Larry Tom Whittington each testified that defendant often went several days without consuming cocaine, thereby refuting defendant's argument that his cocaine usage had been so habitual as to warrant an inference he had ingested cocaine at a time relevant to the Bautista killings.

On this record, the trial court was not obligated to instruct the jury in the manner requested by defendant. (See *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1178-1181 [270 Cal.Rptr. 286, 791 P.2d 965]; see also *People* v. *Saille* (1991) 54 Cal.3d 1103, 1115-1117 [2 Cal.Rptr.2d 364, 820 P.2d 588].) Evidence that a defendant has ingested a drug at some point in time does not equate to usage at the time of the killings. (*People* v. *Williams* (1988) 44 Cal.3d 1127, 1143 [245 Cal.Rptr. 635, 751 P.2d 901].) Nor does such evidence suggest that defendant suffered impairment related to previous ingestion of cocaine. The paranoia exhibited by defendant concerning "snitches," at the time Larry Tom Whittington visited him at Patricia Shepard's apartment, did not establish that defendant then was ingesting cocaine; the record suggests that defendant was obsessed with "snitches," without regard to whether he was suffering the effects of cocaine intoxication. That defendant may have been "hyper" on the morning he sped into the Rambos' yard, and may have freebased cocaine after his arrival there, similarly does

not establish that he had ingested cocaine shortly before the killings (which could have occurred several hours earlier).

Thus, the trial court's ruling was correct. Evidence of defendant's alleged voluntary intoxication was " 'too insubstantial to require submission of the defense to the jury.' " (*People* v. *Williams, supra,* 44 Cal.3d at p. 1143 [citing the cases].)

### 6. *Cumulative error*

 Defendant contends that the cumulative effect of the alleged errors committed by the trial court during the guilt phase requires reversal of his conviction. Having reviewed these alleged errors, we conclude that they were few and generally trivial, and that the only error of significance was the trial court's instruction of the jury pursuant to special instruction No. 3, which, as we have discussed, improperly allowed the jury to consider evidence of defendant's other crimes for the purpose of ascertaining defendant's character. Even when viewed cumulatively, the errors committed fall far below the showing required to warrant reversal based upon cumulative error. Defendant's contention as to cumulative error therefore is without merit.

### III. PENALTY PHASE ISSUES

#### A. *Unadjudicated criminal activity*

At the penalty phase, the prosecution introduced evidence in aggravation pertaining to defendant's 1982 arrest for the kidnapping of Diane Sems (§ 207) and possession of an explosive device (§ 12303.2), as well as evidence pertaining to his 1981 arrest for possession of a machine gun (§ 12220, subd. (a)) and for being an ex-felon in possession of concealable firearms (former § 12021, subd. (a)). (§ 190.3.)

 Defendant contends that the judgment of death must be reversed because the trial court permitted the prosecution to introduce evidence in aggravation pertaining to defendant's unadjudicated criminal activity.[29] His challenge rests upon four distinct arguments, none of which has merit.

 First, defendant challenges the admission of evidence involving dismissed charges stemming from his 1982 arrest for kidnapping and possession of an explosive device, and from his 1981 arrest for possession of a

---

[29]At the penalty phase, the prosecution also introduced evidence of prior criminal acts by defendant that resulted in conviction: a 1981 conviction for possession of a silencer (§ 12520) and a 1972 conviction for burglary (§ 459). Defendant does not challenge the admission of this evidence.

machine gun and for being an ex-felon in possession of concealable firearms. Defendant argues that the introduction of such evidence violated his state and federal constitutional guaranties to a reliable sentence and to due process of law. He acknowledges that this court previously has rejected similar arguments in *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480], but requests that we reconsider our holding in that case. We decline to do so, observing that we repeatedly have rejected similar constitutional challenges to the admission of unadjudicated crimes. (See, e.g., *People* v. *Pinholster* (1992) 1 Cal.4th 865, 973 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People* v. *Jackson* (1989) 49 Cal.3d 1170, 1208 [264 Cal.Rptr. 852, 783 P.2d 211].)[30]

Second, defendant contends that he should be "deemed acquitted" of his 1981 offenses involving possession of a machine gun and of possession of an illegal weapon by an ex-felon. This contention is not supported by the record. Defendant pleaded guilty to possession of a silencer; the other charges were dismissed without a judicial determination as to their truth or falsity. A bargained conviction or dismissal does not constitute an acquittal under section 190.3. (*People* v. *Heishman, supra,* 45 Cal.3d at p. 193; *People* v. *Melton* (1988) 44 Cal.3d 713, 755 [244 Cal.Rptr. 867, 750 P.2d 741].)

 Third, we reject defendant's contention that the unadjudicated criminal activity that occurred in 1981 and 1982 was impermissibly "stale" at the time of defendant's trial in 1987. (See *People* v. *Balderas, supra,* 41 Cal.3d at p. 202 [§ 190.3, factor (b), imposes no time limitation on introduction of defendant's prior violent criminality]; see also *People* v. *Douglas* (1990) 50 Cal.3d 468, 529-530 [268 Cal.Rptr. 126, 788 P.2d 640] [evidence of prior violent activity not stale even though it occurred more than seven years earlier]; *People* v. *Heishman, supra,* 45 Cal.3d at p. 192 [introduction of evidence under § 190.3, factor (b), is not subject to exclusion on the ground that prosecution for the acts would be barred by the applicable statute of limitations]; *People* v. *Jennings* (1991) 53 Cal.3d 334, 388 [279 Cal.Rptr. 780, 807 P.2d 1009] [same].)

Fourth, we reject defendant's contention that introduction of evidence pertaining to his 1981 crimes was barred by the constitutional guarantee against being placed twice in jeopardy. This guarantee is inapplicable where evidence of prior criminal activity is introduced in a subsequent trial as an

---

[30]Defendant does not challenge explicitly the admission of his unadjudicated criminal activity on the basis that section 190.3, factor (b), is void for "vagueness." (See *Stringer* v. *Black* (1992) 503 U.S. __ [117 L.Ed.2d 367, 112 S.Ct. 1130]; see also *Bacigalupo* v. *California* (1992) 506 U.S. __ [121 L.Ed.2d 5, 113 S.Ct. 32].) To the extent that defendant's challenge can be so interpreted, we reject his claim. (See *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 594-595 [15 Cal.Rptr.2d 382, 842 P.2d 1142].)

aggravating factor for consideration by a penalty phase jury. (*People* v. *Melton*, *supra*, 44 Cal.3d at pp. 754-755; see also *People* v. *Taylor* (1990) 52 Cal.3d 719, 742-743 [276 Cal.Rptr. 391, 801 P.2d 1142]; *People* v. *Frank* (1990) 51 Cal.3d 718, 728-729 [274 Cal.Rptr. 372, 798 P.2d 1215]; *People* v. *Douglas*, *supra*, 50 Cal.3d at pp. 528-529.) We decline defendant's request to reconsider the applicability of our recent decisions in *Melton*, and its progeny, to the sentencing phase of a capital case.

### B. *Other criminal activity and victim-impact evidence*

Defendant contends that the judgment of death must be reversed because the trial court, over defendant's objection, admitted the testimony of Diane Sems, who, as described above, related to the penalty phase jury that in 1982 she had been forced into a pickup truck by an acquaintance named Terry Fabricant, blindfolded, and driven by another man to a house she did not recognize. After a few hours, she escaped and contacted the police. The following day, she identified the driver in a photo lineup. At trial, she recalled making a photo identification and, when asked on direct examination whether defendant appeared to be the same man who had driven the pickup truck, she replied, "I think so." On cross-examination, however, she acknowledged she was unsure who had driven the truck. Her identification of defendant (on direct examination) subsequently was corroborated by Philip Quartararol, the police detective employed by the City of Los Angeles who had shown her the photo lineup, and who testified at trial that Sems had selected defendant's photograph.

Relying upon *People* v. *Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423], defendant argues that insufficient evidence supported the trial court's ruling admitting Sems's testimony. Defendant also argues that Sems's testimony was irrelevant and inflammatory. (See *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529]; see also *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207].) We reject each of these contentions.

#### 1. *The trial court's ruling was supported by substantial evidence*

 Prior to the admission of Diane Sems's testimony, at defendant's request the trial court conducted a preliminary inquiry outside the presence of the jury to ascertain whether there was substantial evidence to establish that defendant had kidnapped Sems. (See *People* v. *Phillips*, *supra*, 41 Cal.3d 29, 72-73, fn. 25.) Defendant argued that Sems's inability at trial to identify defendant positively as the driver of the pickup truck, and the prosecution's reliance on a prior, out-of-court photo identification, rendered her testimony

legally insufficient, because the evidence did not establish, beyond a reasonable doubt, defendant's involvement in the alleged kidnapping. The trial court overruled defendant's objection and, on appeal, defendant reiterates his challenge.

Notwithstanding Diane Sems's uncertain identification of defendant at trial, her prior photo identification of defendant, made one day after the alleged kidnapping, constituted sufficient evidence to support the trial court's ruling that the prior incident properly could be considered by the jury. (See *People* v. *Lucky* (1988) 45 Cal.3d 259, 287-290 [247 Cal.Rptr. 1, 753 P.2d 1052].) The trial court correctly ruled that Sems's photo identification of defendant was admissible under the prior identification exception to the hearsay rule, codified in Evidence Code section 1238.[31] Contrary to defendant's assertion, the admissibility of evidence pertaining to the alleged kidnapping did not turn upon whether the prosecution could establish beyond a reasonable doubt that defendant was the driver of the pickup truck. (*People* v. *Hendricks* (1988) 44 Cal.3d 635, 648 [244 Cal.Rptr. 181, 749 P.2d 836].) Rather, the question whether defendant's other criminal activity (including the Sems incident) was proved beyond a reasonable doubt presented a question of fact for the jury. (Evid. Code, § 312; *People* v. *Phillips*, *supra*, 41 Cal.3d at p. 72, fn. 25.) ▆▆ At the conclusion of the penalty phase, the trial· court correctly instructed the jury that, before it could consider defendant's other criminal activity, the jury had to be satisfied beyond a reasonable doubt that the defendant did, in fact, commit such activity. ▆▆ The trial court's ruling as to Sems's testimony was correct, and the evidence properly was admitted.

### 2. *Sems's testimony constituted admissible victim-impact evidence*

▆▆ Defendant's challenge to the trial court's admission of Diane Sems's testimony on the ground that her testimony constituted impermissible victim-impact evidence is misplaced. We previously have rejected the argument that *Booth* v. *Maryland*, *supra*, 482 U.S. 496, and *South Carolina* v. *Gathers*, *supra*, 490 U.S. 805, bar the introduction of evidence relating to "the nature and circumstances of other criminal activity involving the use or

---

[31]Evidence Code section 1238 provides:

"Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying and:

"(a) The statement is an identification of a party or another as a person who participated in a crime or other occurrence;

"(b) The statement was made at a time when the crime or other occurrence was fresh in the witness'[s] memory; and

"(c) The evidence of the statement is offered after the witness testifies that he made the identification and that it was a true reflection of his opinion at the time."

threat of force or violence or the effect of such criminal activity on the victims . . . ." (*People* v. *Benson* (1990) 52 Cal.3d 754, 797 [276 Cal.Rptr. 827, 802 P.2d 330]; see also *People* v. *Edwards* (1991) 54 Cal.3d 787, 832-837 [1 Cal.Rptr.2d 696, 819 P.2d 436].) The prosecution was entitled to present testimonial evidence of defendant's violent "criminal activity." (§ 190.3, factor (b); *People* v. *Belmontes* (1988) 45 Cal.3d 744, 808-809 [248 Cal.Rptr. 126, 755 P.2d 310].) Moreover, the proscription against the use of victim-impact evidence at the sentencing stage largely has been overruled. (*Payne* v. *Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 734-734, 111 S.Ct. 2597, 2608-2611]; see also *People* v. *Thomas, supra,* 2 Cal.4th 489, 535.) We therefore conclude that the trial court did not err in admitting Sems's testimony.

## C. *Weapons evidence*

As part of her testimony pertaining to the kidnapping, Diane Sems stated she observed various weapons at the residence where she had been held captive. In corroboration, the prosecution introduced the testimony of Philip Quartararol, the City of Los Angeles police detective who participated in a police search of the residence shortly after Sems escaped and reported the kidnapping. Quartararol testified that, during his search of the residence, he found two semiautomatic weapons, two shotguns, and "several thousand rounds of ammunition." On cross-examination, Quartararol acknowledged that, under the law in effect at the time he conducted the search in 1982, it was not illegal for an ex-felon to possess the weapons discovered during the search.[32]

The prosecution also presented the testimony of Douglas Gerst, a City of Los Angeles police officer, who participated in two police searches of defendant's residence in 1981. Gerst testified that, during these searches, he seized a Mac Ten machine gun (together with a silencer and ammunition he found nearby), six revolvers, two automatic pistols, six rifles, and twelve shotguns. Gerst also testified that "there were thousands of rounds of ammunition throughout the residence." He found mail and utility receipts addressed to defendant at the residence.[33]

On appeal, defendant contends that the judgment of death must be reversed because the trial court admitted the foregoing evidence involving

---

[32]The trial court instructed the jury pursuant to special instruction No. 13, which provided, in pertinent part, that the testimony of Quartararol regarding the seizure of weapons and ammunition "may be considered only for the limited purpose of corroborating the testimony of Diane Sems. [¶] You shall not consider, take into account or be guided by that testimony for any other purpose."

[33]The trial court instructed the jury pursuant to special instruction No. 11, which provided, in pertinent part, that the jury was to consider Gerst's testimony "only for the limited purpose of determining beyond a reasonable doubt whether the defendant possessed a machine gun, a

weapons. Defendant argues that this evidence should not have been admitted, because: (1) the trial court had rejected defendant's request to conduct a hearing pursuant to *People* v. *Phillips, supra,* 41 Cal.3d 29, 72-73, footnote 25, to ascertain whether defendant's possession of the weapons constituted a crime; (2) the evidence did not constitute a proper aggravating factor under section 190.3; and (3) introduction of this evidence was highly prejudicial. We reject each of these contentions for the reasons set forth below.

### 1. *Defendant failed to preserve the issue*

 The record does not support defendant's contention that the trial court denied his request for a hearing under *Phillips, supra,* 41 Cal.3d 29. Rather, defendant requested such a hearing only on the kidnapping issue, discussed *ante,* and on the charge that at the time of his 1982 arrest in connection with the Sems incident, he was found to have been in possession of an explosive device. (§ 12303.2.) Defendant's challenge to the weapons evidence was based upon its alleged staleness and the prior dismissal of the weapons charges. Defendant did not request a hearing on the question whether the weapons discovered by law enforcement officers during their searches of his residence constituted criminal activity. Thus, defendant has failed to preserve this issue for review. (Evid. Code, § 353, subd. (a); *People* v. *Mickle* (1991) 54 Cal.3d 140, 186 [284 Cal.Rptr. 511, 814 P.2d 290]; *People* v. *Green* (1980) 27 Cal.3d 1, 27-34 [164 Cal.Rptr. 1, 609 P.2d 468].)

### 2. *The weapons evidence properly was admitted*

 Even if defendant had preserved the foregoing issue, our rejection of defendant's argument on the merits would be warranted for two distinct reasons. First, we have held that a hearing under *Phillips, supra,* 41 Cal.3d 29, may be unnecessary where, as was the case here, substantial evidence establishes each element of the alleged prior offense. (*People* v. *Jennings, supra,* 53 Cal.3d 334, 388-389.) Second, the police searches in this case uncovered a machine gun, a silencer beside it, and concealable handguns; defendant's possession of these firearms was illegal. (§ 12021, subd. (a) [possession of a firearm by an ex-felon]; § 12220, subd. (a) [possession of a machine gun].) His possession of such an arsenal clearly involved "the implied threat to use force or violence." (§ 190.3, factor (b); see generally, *People* v. *Ramirez, supra,* 50 Cal.3d at pp. 1186-1187 [possession of concealed knife at California Youth Authority facility]; *People* v. *Grant* (1988) 45 Cal.3d 829, 849-851 [248 Cal.Rptr. 444, 755 P.2d 894] [inmate's possession of prison-made shank].) Defendant's possession of a silencer found next

silencer and handguns with a barrel length of twelve inches or less. You shall not consider, take into account or be guided by that testimony for any other purpose. . . ."

to the machine gun strengthens this conclusion and itself constitutes a felony. (§ 12520.)[34]

### 3. *No prejudice appears*

■■■ Contrary to defendant's assertion, the introduction of the weapons testimony was not unduly prejudicial. During the guilt phase, the jury had heard that defendant possessed firearms. Susan Rambo had testified that defendant always was armed with a gun. At the penalty phase, the jury properly was advised of defendant's felony conviction for possession of a silencer. Having heard these facts, and already having found defendant guilty of killing Maureen and Telesforo Bautista, the jury was unlikely to have been swayed by the penalty phase testimony of Diane Sems, Douglas Gerst, and Philip Quartararol linking defendant to the possession of various firearms. Any possibility that the jury might have been unduly influenced by this evidence was precluded by the trial court's limiting instructions.

### D. *Alleged prosecutorial misconduct*

Defendant contends that the prosecutor improperly argued several issues to the jury. As explained below, we find this contention to be without merit.

### 1. *Future dangerousness*

In his opening statement to the jury at the penalty phase, defense counsel stated that defendant's prison history indicated that defendant was "what you might call a model prisoner." Counsel also introduced into evidence a document summarizing defendant's successful adjustment to prison life. In response, the prosecutor suggested in closing argument that defendant presented a future danger.

■■■ On appeal, defendant contends that the prosecutor's argument pertaining to defendant's future dangerousness was unsupported by the evidence, and therefore violative of defendant's constitutional rights to due process of law and to be free from cruel and unusual punishment. Defendant also contends that the prosecutor's argument mirrored an argument that we have held impermissibly urged the jury to view the absence of mitigating

---

[34]The trial court opined that it may have committed a "de minimis" error in admitting the testimony regarding defendant's lawful possession of rifles and shotguns. With respect to the rifles and shotguns found during the searches conducted in 1981, we agree. But with regard to the search conducted in 1982, testimony regarding defendant's lawful possession of firearms was admissible as a circumstance of the kidnapping. (§ 190.3, factor (b).)

evidence as a factor in aggravation. (See *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861].)

We reject these contentions. Defendant's failure to interpose an objection during the prosecutor's argument constituted a waiver of his present claims of error. (*People* v. *Duncan* (1991) 53 Cal.3d 955, 976-977 [281 Cal.Rptr. 273, 810 P.2d 131]; *People* v. *Green, supra*, 27 Cal.3d at pp. 27-34.) Even if defendant properly had preserved the issue, his arguments would fail. The prosecutor's argument did not invite the jury to speculate concerning defendant's future dangerousness as a factor in aggravation. (See *People* v. *Malone* (1988) 47 Cal.3d 1, 31 [252 Cal.Rptr. 525, 762 P.2d 1249] [and cases cited therein].) Rather, the argument permissibly was aimed at persuading the jury not to accord significant weight to the defense evidence, proffered in mitigation, that defendant had been (and, presumably, would continue to be) a model prisoner. (See *People* v. *Douglas, supra*, 50 Cal.3d at pp. 535-536.) Nor did the prosecutor convert mitigating evidence into aggravating evidence. His statement that there was no evidence suggesting defendant could be rehabilitated, and that defendant posed a threat of violence, constituted fair comments upon defendant's violent criminal past and therefore did not run afoul of *Davenport*'s proscription against arguing the absence of mitigating factors as a factor in aggravation. (See also *People* v. *Bell* (1989) 49 Cal.3d 502, 548-550 [262 Cal.Rptr. 1, 778 P.2d 129] [comment on future dangerousness is permissible if based upon evidence or inferences drawn from that evidence].) We conclude that the prosecutor's comments regarding defendant's future dangerousness constituted "the sort of vigorous argument a prosecutor is entitled to make." (*People* v. *Thompson, supra*, 45 Cal.3d at p. 125; see also *People* v. *Davenport, supra*, 41 Cal.3d at p. 288.)

### 2. *Circumstances of the crime*

In his closing argument, the prosecutor asked the jury to consider the circumstances of the Bautista killings, and to imagine those crimes from the victims' perspective. ■ On appeal, defendant contends that the prosecutor's argument relied upon speculative inferences, was unsupported by the evidence, and injected constitutionally irrelevant considerations, such as the victims' personal characteristics. Defendant further contends that the prosecutor's remarks were designed to inflame and prejudice the jury by focusing the jury's attention upon Telesforo Bautista's diminutive stature and emotional attachment to defendant. In defendant's view, the prosecutor's comments regarding Telesforo's physical and emotional vulnerability constituted improper "victim-impact" evidence under *Booth* v. *Maryland, supra*, 482 U.S. 496, and *South Carolina* v. *Gathers, supra*, 490 U.S. 805.

We reject defendant's contentions. His failure to object below bars appellate review of the issue. (*People* v. *Duncan, supra,* 53 Cal.3d at pp. 976-977; *People* v. *Green, supra,* 27 Cal.3d at pp. 27-34.) Even if defendant properly had preserved the issue, rejection of defendant's position would be warranted. The prosecutor's comments properly reminded the jury of the "circumstances of the crime." (§ 190.3, factor (a).) The references to Telesforo Bautista's vulnerability reminded the jury that the boy was not one who reasonably could have defended himself, or his mother, against an angry, knife-wielding assailant bent on silencing them both. Thus, Telesforo's slight build, his witnessing of his mother's slaying, and his emotional attachment to her (and to defendant) all served to remind the jury of the cruel and brutal manner of the killings. (See *People* v. *Carrera* (1989) 49 Cal.3d 291, 336-337 [261 Cal.Rptr. 348, 777 P.2d 121] [likelihood that stabbing victims did not resist attack bore directly upon the manner of the murders and therefore was a circumstance of the crimes].) Nor was it improper for the prosecutor to ask the jury to imagine the crimes from the victims' perspective. (*People* v. *Lewis* (1990) 50 Cal.3d 262, 283-284 [266 Cal.Rptr. 834, 786 P.2d 892].) The prosecution's request that the jury give consideration to the terror that the victims experienced did not call for speculation or violate *Booth* and *Gathers,* but rather was based upon reasonable inferences to be drawn from the evidence. (*People* v. *Marshall* (1990) 50 Cal.3d 907, 929 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Douglas, supra,* 50 Cal.3d at pp. 536-537.) Finally, the prosecutor reminded the jury that he did not seek a verdict based upon passion, but instead urged "a rational verdict based on the law and the evidence."

### 3. *Military service*

In his closing argument, the prosecutor briefly referred to defendant's military service.[35] ■ On appeal, defendant contends that the prosecutor mentioned defendant's military service in Vietnam in an impermissible manner, attempting to convert mitigating evidence into aggravating evidence. We disagree. Not only did defendant waive this issue by failing to object at trial, but his argument is deficient because it is unsupported by the record. The prosecutor did not argue that defendant's military service was an aggravating factor; rather, the prosecutor argued it was not mitigating. (See *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1271-1273 [270 Cal.Rptr. 451, 792

---

[35]The prosecutor stated, in pertinent part: "A lot of people went to Viet Nam. A lot of people went to Viet Nam; a lot of them didn't come back. Among those who did come back are quadriplegics, people horribly scarred for the rest of their lives, people who nonetheless want to be and have been and surely will continue to be contributing members of this society. They're not kid killers. What is there about his army service, then, that tells you that you should spare his life? His experiences, no doubt, aren't unique. . . ."

P.2d 251] [prosecutor's argument regarding defendant's military service did not convert mitigating evidence into aggravating evidence, but simply illustrated that defendant's actions after leaving the military demonstrated that he had the ability to choose between good and evil, and that he had selected evil].) Moreover, the jury specifically was instructed that it could consider defendant's military service as a mitigating factor.

### 4. *Sympathy*

In his closing argument, the prosecutor briefly referred to the jury's opportunity to consider sympathy for the defendant.[36] ██ On appeal, defendant contends that the prosecutor's argument improperly suggested to the jury that it was precluded from considering, as a factor in mitigation, its sympathy for defendant. We disagree. Not only has defendant failed to preserve this issue, but his contention is unsupported by the record. The prosecutor informed the jury that it could consider sympathy, mercy, and sentiment for the defendant. That the prosecutor suggested defense counsel "no doubt must urge you" to consider sympathy does not imply that defense counsel was only "doing his duty," or that there was no legitimate basis for showing mercy or sympathy to defendant. Defendant's contention is hypertechnical and misconstrues the prosecutor's argument.

### E. *Miscellaneous contentions*

Defendant submits four claims of constitutional error that in recent years have been rejected by this court. They are:

(1) that the 1978 death penalty statute is unconstitutional on its face and as applied, due to its lack of procedural safeguards (*People* v. *Alcala* (1992) 4 Cal.4th 742, 809-810 [15 Cal.Rptr.2d 432, 842 P.2d 1192], and cases cited therein);

(2) that the trial court erred in instructing the jury pursuant to a modified version of CALJIC No. 8.84.2 (1986 rev.) (the "*Brown*" instruction [cf. *People* v. *Brown* (1985) 40 Cal.3d 512, 538-544 [220 Cal.Rptr. 637, 709 P.2d 440]), informing them that in order "[t]o return a judgment of death, each of you must be persuaded that the aggravating evidence or circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole" (*People* v. *Marshall*,

---

[36]The prosecutor stated, in pertinent part: "These are brutal savage facts, very raw, but you found them and determined them to be true. Those factors in mitigation, those factors that the defense no doubt must urge you to consider in sparing his life, include the giving of any mercy or any sympathy or any kind of sentimentality to the defendant. The People's response to that is how much did he show to Telesforo? How much mercy did he show to that child?"

*supra*, 50 Cal.3d at pp. 933-935; *People* v. *Lewis*, *supra*, 50 Cal.3d at pp. 281-282);

(3) that the trial court erred in failing to instruct the jury pursuant to a special instruction (withdrawn by defense counsel) that would have informed them that a mitigating circumstance need not be proved beyond a reasonable doubt, but that the jury was required to find the existence of a mitigating circumstance if there was any substantial evidence to support it (*People* v. *Bonillas* (1989) 48 Cal.3d 757, 789-790 [257 Cal.Rptr. 895, 771 P.2d 844]);

(4) that the trial court erred in failing to instruct the jury pursuant to a special instruction (withdrawn by defense counsel) that would have informed them that other-crimes evidence could not be considered as evidence in aggravation unless the jury agreed unanimously that the other crime had been proved beyond a reasonable doubt (*People* v. *Allison* (1989) 48 Cal.3d 879, 899 [258 Cal.Rptr. 208, 771 P.2d 1294]; see also *People* v. *Thompson* (1990) 50 Cal.3d 134, 185 [266 Cal.Rptr. 309, 785 P.2d 857]).

Defendant fails to persuade us that there is any reason for us to reconsider these recent rulings, and we therefore decline to do so.

F. *Cumulative impact of error*

 Defendant contends that the cumulative impact of error at the guilt and penalty phases of his trial undermined the reliability of the sentencing process, mandating that his death sentence be set aside. We reject this contention. The few errors committed at defendant's trial fail to "raise a reasonable possibility that the jury might have reached a more favorable result had such error or errors not occurred." (*People* v. *Lewis*, *supra*, 50 Cal.3d at p. 285.)[37]

## DISPOSITION

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Arabian, J., and Baxter, J., concurred.

MOSK, J.—I concur in the judgment. After review, I have found no prejudicial error or other defect.

---

[37]We also note that defendant filed a petition for writ of habeas corpus, contending that defense counsel rendered ineffective assistance of counsel throughout the proceedings, undermining the reliability of the jury's verdicts reached at the conclusion of the guilt and penalty phases of the trial. On September 1, 1993, we denied defendant's petition on the merits. (Mosk, J., was of the opinion that an order to show cause should issue.) (*In re Garceau on Habeas Corpus*, S022420.)

I also concur generally in Justice George's opinion for the court. In my view, it is substantially sound in reasoning and manifestly correct in result.

I write separately to address defendant's claim that the trial court erred when it instructed the jury that it might consider evidence that he committed crimes other than the charged murders "for any purpose, including but not limited to" "[h]is character or any trait of his character" and "[h]is conduct on a specific occasion . . . ."

I believe that the "other crimes" instruction was erroneous under California law. It impermissibly allowed the jury to use the evidence in question to infer that defendant was possessed of a bad character or had a disposition or propensity to commit unlawful acts, and that he conducted himself accordingly with respect to the charged murders. It should not have done so. (See, e.g., *People* v. *Hayes* (1990) 52 Cal.3d 577, 625 [276 Cal.Rptr. 874, 802 P.2d 376] [impliedly approving an instruction that "warned the jury *not* to consider the other-crimes evidence to prove that [the] defendant was a person of bad character or had a disposition to commit crimes" (italics in original)]; cf. Evid. Code, § 1101, subd. (a) [providing that, as a general matter, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion"].) It goes without saying that a charge of this sort should never again be given.

I shall assume that the "other crimes" instruction was also erroneous under the United States Constitution. The due process clause of the Fourteenth Amendment "protects the accused against conviction except upon proof [by the state] beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged" (*In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068]), including, of course, identity. If an instruction lightens the state's burden, it violates due process. (See, e.g., *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 520-524 [61 L.Ed.2d 39, 48-51, 99 S.Ct. 2450].) It is argued that the instruction here effectively did so.

On the assumption that it offends the due process clause of the Fourteenth Amendment, the "other crimes" instruction would be subject to harmless-error analysis under *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. "The *Chapman* test is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (*Yates* v. *Evatt* (1991) 500 U.S. 391, 402-403 [114 L.Ed.2d 432, 448, 111 S.Ct. 1884, 1892].) "To say that an error did not contribute to the verdict is . . . to find that error unimportant in

relation to everything else the jury considered on the issue in question . . . ." (*Id.* at p. 403 [114 L.Ed.2d at p. 449, 111 S.Ct. at p. 1893].)

Turning to the case at bar, I conclude that the "other crimes" instruction was harmless beyond a reasonable doubt under *Chapman.*

To be sure, in the general case an instruction allowing the jury to use "other crimes" evidence to infer that the defendant is possessed of a bad character or has a disposition or propensity to commit unlawful acts, and that he conducted himself accordingly with respect to the charged offenses, poses a " 'grave danger of prejudice' to [the] accused . . . ." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 317 [165 Cal.Rptr. 289, 611 P.2d 883].)

This, however, is *not* the general case. On several occasions and to several persons, defendant confessed that he committed the charged murders. By evidence both physical and testimonial, his confessions were corroborated.

It has been stated that a confession may have an "indelible impact" on the jury, inducing it "to rest its decision on that evidence alone, without . . . consideration of" the rest. (*Arizona* v. *Fulminante* (1991) 499 U.S. 279, 313 [113 L.Ed.2d 302, 333, 111 S.Ct. 1246, 1266] (conc. opn. of Kennedy, J.).)

If even a single confession may have such an "indelible impact," several confessions—as in this case—must practically compel the jury to return a guilty verdict no matter what the other evidence says or does not say.

Hence, to my mind, the "other crimes" instruction proved to be "unimportant in relation to everything else the jury considered on the issue in question . . . ." (*Yates* v. *Evatt, supra,* 500 U.S. at p. 403 [114 L.Ed.2d at p. 449, 111 S.Ct. at p. 1893].) Therefore, "it appears 'beyond a reasonable doubt that [it] did not contribute to the verdict . . . .' " (*Id.* at pp. 402-403 [114 L.Ed.2d at p. 448, 111 S.Ct. at p. 1892].)

Because I have found no prejudicial error or other defect, I concur in the judgment.

**KENNARD, J.**—I concur in the affirmance of the judgment as to both guilt and penalty. I write separately to explain my reasons for concluding that the guilt verdicts should be affirmed even though the trial court erred in instructing the jury that it could consider evidence of the Rambo murder for "any purpose," including defendant's "character or any trait of his character."

In assessing the prejudice to a criminal defendant from an error that permits the jury to consider the defendant's uncharged acts as evidence of

character or criminal propensity, this court and the Courts of Appeal have consistently applied the harmless error standard required by our state Constitution (Cal. Const., art. VI, § 13) and articulated in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. (See, e.g., *People* v. *Miranda* (1987) 44 Cal.3d 57, 83 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Alcala* (1984) 36 Cal.3d 604, 636 [205 Cal.Rptr. 775, 685 P.2d 1126]; *People* v. *Dominguez* (1981) 121 Cal.App.3d 481, 501 [175 Cal.Rptr. 445]; *People* v. *Moran* (1973) 33 Cal.App.3d 724, 729 [109 Cal.Rptr. 287].) Defendant urges this court to depart from this consistent practice of applying the state harmless error standard and to apply instead the federal standard as described in *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065], and further explained in *Yates* v. *Evatt* (1991) 500 U.S. 391 [114 L.Ed.2d 432, 111 S.Ct. 1884]. Defendant maintains that the federal standard is required because the error denied him the due process of law guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

Defendant cites no holding under the federal Constitution prohibiting jury consideration of uncharged crimes to prove criminal propensity. Indeed, the United States Supreme Court just two years ago declined to express an opinion "on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." (*Estelle* v. *McGuire* (1991) 502 U.S. __, __, fn. 5 [116 L.Ed.2d 385, 401, 112 S.Ct. 475, 484, fn. 5].) Nevertheless, defendant argues that the instruction in this case denied him due process of law by permitting the jury to consider irrelevant evidence and by lightening the prosecution's burden of proof. I find neither argument sufficiently persuasive to justify use of the federal test, at least until this court receives more explicit guidance from the United States Supreme Court.

Whether an instruction permitting jury consideration of irrelevant evidence would violate a criminal defendant's right of due process under the federal Constitution is at present unclear. (Compare *Estelle* v. *McGuire*, *supra*, 502 U.S. __ [116 L.Ed.2d 385, 397-398, 112 S.Ct. 475, 481] [". . . we need not explore further the apparent assumption of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial"], with *Barnes* v. *United States* (1973) 412 U.S. 837, 844-845 [37 L.Ed.2d 380, 386-387, 93 S.Ct. 2357] ["Common-law inferences, like their statutory counterparts, must satisfy due process standards in light of present-day experience."]; see also *People* v. *Castro* (1985) 38 Cal.3d 301, 313 [211 Cal.Rptr. 719, 696 P.2d 111] (plur. opn.).) For present purposes, I will assume, without deciding, that the federal Constitution prohibits any state

rule that would permit a criminal conviction to be based in whole or in part on irrelevant considerations.

Even so, defendant's argument is defective because propensity evidence is not, as defendant maintains, irrelevant to guilt in a criminal prosecution. Although courts and commentators have given various explanations for the rule excluding propensity evidence, they agree that the evidence has probative value to establish guilt. (See, e.g., *Michelson* v. *United States* (1948) 335 U.S. 469, 476 [93 L.Ed. 168, 174, 69 S.Ct. 213]; *People* v. *Smallwood* (1986) 42 Cal.3d 415, 428 [228 Cal.Rptr. 913, 722 P.2d 197]; *People* v. *Alcala, supra,* 36 Cal.3d 604, 630-631; *People* v. *Thompson* (1980) 27 Cal.3d 303, 317 [165 Cal.Rptr. 289, 611 P.2d 883]; *People* v. *Schader* (1969) 71 Cal.2d 761, 772 [80 Cal.Rptr. 1, 457 P.2d 841]; IA Wigmore on Evidence (Tillers rev. ed. 1983) § 58.1, p. 1211; 1 McCormick on Evidence (4th ed. 1992) § 190, pp. 797-798.) Because propensity evidence is relevant to guilt, its consideration by the jury cannot violate the federal Constitution's implied proscription (assuming there is one) against jury consideration of irrelevant evidence.

The decisions of the United States Supreme Court do not establish that errors of the kind at issue here—that is, violations of state rules barring jury consideration of evidence that is relevant but unduly prejudicial—contravene the federal Constitution by lightening the prosecution's burden of proof. It is true of course that *any* trial error that has *any* potential for prejudicing the defendant makes conviction marginally more likely and in this sense lightens the prosecution's burden of proof. But it cannot be that every such error thereby becomes one of federal constitutional significance. On the contrary, the United States Supreme Court has, in its own words, " 'defined the category of infractions that violate "fundamental fairness" very narrowly.' " (*Estelle* v. *McGuire, supra,* 502 U.S. __ [116 L.Ed.2d 385, 398-399, 112 S.Ct. 475, 482], quoting *Dowling* v. *United States* (1990) 493 U.S. 342, 352 [107 L.Ed.2d 708, 720, 110 S.Ct. 668].)

The error here did not influence the jury's understanding of either the elements of the charged offenses or the prosecution's burden of proof. Therefore, I am not persuaded that the error lightened the prosecution's burden of proof in a manner constituting a federal constitutional violation.

Having concluded that the argument for federal constitutional error is insubstantial, I would continue to apply our state harmless error standard, under which a judgment will be reversed for error only when, after an examination of the entire cause, including the evidence, the reviewing court is of the opinion that it is reasonably probable that a result more favorable to

the defendant would have been reached in the absence of the error. (*People v. Watson, supra*, 46 Cal.2d 818, 836.) Applying this standard here, I find the error harmless.

The majority reasons that the error was not prejudicial because the prosecution presented "overwhelming evidence establishing defendant's guilt of the charged offenses[.]" (Maj. opn., *ante*, at p. 187.) But, as defendant points out, the strength of the prosecution's evidence in this case depended upon the credibility of the prosecution's witnesses who testified to defendant's confessions and admissions. Each of these witnesses participated to some extent in the drug operation, and exposure of the drug operation thus threatened each of them, just as it threatened defendant. The charged murders occurred in the apartment of one of these witnesses (Patricia Shepard) and the victims' bodies were buried at the residence of another witness (Susan Rambo). A third witness (Larry Tom Whittington) admittedly participated in moving the bodies and concealing evidence of the murders. None of the witnesses came forward until long after the murders had occurred, and all had ample time to prepare and coordinate a story placing the blame on defendant. Evidence that depends on the credibility of such witnesses can hardly be deemed overwhelming.

Nevertheless, I am satisfied that defendant was not prejudiced by the court's instruction permitting the jury to consider the Rambo murder as propensity evidence. The instruction could prejudice defendant only if the jury first determined that it was defendant who had killed Rambo, then inferred from this killing that defendant was a violent person capable of murder, and finally used this inference about defendant's character to conclude that defendant committed the charged offenses. But the evidence identifying defendant as Rambo's killer, like the evidence identifying defendant as the perpetrator of the charged murders, consisted primarily of the testimony of other members of the drug ring, with little or no physical evidence tying defendant to the crime. To conclude that defendant had killed Rambo, the jury would have had to find the prosecution's witnesses credible. If the jury believed them as to Rambo's murder, it would almost inevitably believe them as to the charged murders as well.

This analysis is consistent with the defense strategy. The defense recognized that the credibility of the prosecution's witnesses was the key issue—virtually the only issue—in the case. The defense did not oppose admission of the Rambo murder evidence because it viewed that evidence as less credible than the evidence of the charged murders. Thus, the defense was counting on the jury to disbelieve the prosecution's witnesses as to the Rambo murder, and by this means to undermine their credibility as to the charged murders.

Given the nature of the credibility contest presented to the jury, it is highly unlikely that the jury in reaching its guilt verdicts relied to any significant degree on inferences about defendant's character drawn from the Rambo murder. For this reason, it is not reasonably probable that the jury would have returned a verdict more favorable to defendant had the trial court not given the erroneous instruction.

Appellant's petition for a rehearing was denied January 26, 1994.